In re COMMONWEALTH of Kentucky, ex rel. Steven L. BESHEAR, Attorney General.
and
Steven L. BESHEAR, Attorney General, Appellant,
v.
John Y. BROWN, Jr., Governor, Commonwealth of Kentucky; Finance and Administration Cabinet, Commonwealth of Kentucky; Save the Mansion, Inc., a Non-Profit Corporation, Appellees.

Court of Appeals of Kentucky.

June 29, 1984.

Steven L. Beshear, Atty. Gen., Robert L. Chenoweth, Asst. Deputy Atty. Gen., Stephen L. Frank, Asst. Atty. Gen., Frankfort, for appellant.

James L. Dickinson, Deputy General Counsel, Charles D. Wickliffe, Frankfort, for appellees.

Before HAYES, C.J., and CLAYTON and HOWARD, JJ.

CLAYTON, Judge.

Steven L. Beshear, in his official capacity as Attorney General of Kentucky, acting on behalf of the citizens of the Commonwealth, appeals from a judgment of the Franklin Circuit Court denying his application for temporary restraining order and permanent injunction and dismissing his petition for declaratory and injunctive relief. The petition of the Attorney General was filed in Franklin Circuit Court on April 18, 1983, following notice by the governor's legal counsel that citizens wishing to tour the private quarters of the executive mansion would be required to pay a fee to Save The Mansion, Inc., a nonprofit organization authorized by permit of the Cabinet for Finance and Administration (Cabinet) to sell tickets for such a tour. Save The Mansion was then engaged in conducting scheduled tours of the mansion for the purpose of raising sufficient monies to retire the remaining renovation debt. Mandatory fees were required of those persons wishing to view any floor of the mansion other than the first, or "state" floor.

In response to an earlier inquiry from the Interim Joint Committee on State Government, Attorney General Beshear had twelve days before, on April 7, 1983, issued an opinion, OAG 83–120, concluding that the Cabinet has no authority to charge fees or ticket costs to the public for a tour of the governor's mansion, nor to issue a

permit to Save The Mansion to do likewise. The Franklin Circuit Court was unpersuaded and, on the day following submission of the Attorney General's petition, April 19, 1983, concluded as a matter of law that the

> ... Cabinet has, in light of its broad authority over the management and control of state property and of the executive mansion in particular, at least implied authority to permit the holding of a 'Mansion Showcase Fundraiser' and the collection of a donation or charge for viewing such a showcase and is vested with reasonable discretion in this regard.

Thus, we are faced with the difficult question of whether the Cabinet has implied authority under Chapters 42, 45 and 56 of the Kentucky Revised Statutes to charge a fee, or to authorize a nonprofit organization to charge a fee, to members of the public wishing to view the publicly-furnished private quarters of the executive mansion. After lengthy consideration, we are inclined to agree with the judgment of the Franklin Circuit Court. Such a fee may be charged by the Cabinet or by the organization it designates through permit. However, we limit our conclusion only insofar as it applies to the private quarters of the executive mansion and reserve for some later date the now academic issue of charging admission to view public buildings generally.

The issue presented in this appeal is troublesome in two separate aspects. First, there is scant judicial authority available for guidance on such a unique matter. Second, the parties' analysis, though capably drafted, falls short of complete accuracy in its characterization of the facts and application of related legal principles. The Commonwealth categorizes the controversy as one in which the former governor and the Cabinet have improperly imposed a fee upon Kentucky citizens to view a public building. The office of the governor and the Cabinet in turn view the matter as being similar to the traditional concept of a landlord-tenant relationship with the Commonwealth being the landlord, the Cabinet its agent, and the Governor their tenant.

They reason that under the term "use" in KRS 11.020 and the common law principle of possession and quiet enjoyment, the governor is entitled to nonrestricted access to the premises, including the right to determine under what conditions the public may have access. They further reason that under KRS 56.463(4)(a) the Cabinet has the statutory authorization to issue a permit to an organization intending to charge admission to the mansion's private quarters.

Contrary to the position of the Commonwealth, the executive mansion is not simply another public building open to citizens without restriction. The private living quarters of the governor, in contrast to state floor of the mansion, have traditionally been placed "off limits" to the general public subject to the governor's decision to permit visitors to enter. As the lower court notes in its conclusions of law, "no statute requires that the executive mansion, or any part thereof, be open for tours by the public and such limited touring of the mansion as has been permitted has been at the discretion of the incumbent Governor of the Commonwealth."

The governor, with respect to his or her private dwelling chambers, stands in much the same position as a tenant employee or lessee of a public landlord-lessor. It is immaterial to the creation of the lessor-lessee relationship that he pays no rent nor executes a formal lease agreement. *Pinnell v. Woods*, 275 Ky. 290, 121 S.W.2d 679 (1938). Such formalities are merely incidents of the lessor-lessee relationship. *Id.* at 680. However, we do not suggest that the governor has merely a right of occupancy incidental to his employment, as might a caretaker or janitor. "The mere right of occupancy of living quarters by an employee does not create the relation of landlord and tenant even though it is necessary for or incidental to the performance of services to be rendered...." *Miracle v. Stewart*, 278 Ky. 158, 128 S.W.2d 613, 615 (1939). The governor in relation to his or her private chambers does not stand in the same class as janitor or caretaker. The Commonwealth has through tradition and

statutory grant parted with control of that portion of the mansion to the extent that the language of KRS 11.020 authorizing the governor "use of the mansion and the furniture there...." Thus, the governor, as an employee-tenant in control of his or her private dwelling quarters has a large measure of discretion as to who will enter the quarters and under what conditions. This discretion is limited only by statute, regulation, and common law interpretation thereof.

■ Our holding on this point, however, does not suggest that a chief executive may operate or permit to operate a purely commercial, for profit, enterprise or business organization in his or her private chambers within the executive mansion. Nor do we presently resolve the issue of whether a nonprofit organization may charge the public admission to view the state floor of the executive mansion. Such questions are purely academic given the present controversy and are specifically reserved for determination at some later date. For now it is enough that we decide simply that the KRS 11.020 and the relationship of the state's chief executive officer to the Commonwealth as employee-tenant to public landlord afford the governor the discretion to permit a nonprofit organization to conduct tours of the private quarters of the executive mansion for the general public in exchange for a monetary fee.

■ The authority of the Cabinet to issue permits to nonprofit organizations to conduct fund raising tours of the mansion's private quarters is implicitly vested in the Cabinet via KRS Chapters 42, 45, and 56, and in specific terms, KRS 56.463(4)(a). Under the language of KRS 56.463(4)(a) the Cabinet has the authority

> "To control the use of any real property owned or otherwise held by the Commonwealth, or any state agency, and to determine for what periods of time and for what purposes any state agency may use the same, including the agency for whose use it was initially acquired or improved, *and to determine what appropriate uses shall be made of such real property during periods that the department finds the same is not required for the purposes of any particular state agency."*

Therefore, when the governor and the Cabinet agree that the private quarters of the executive mansion may be put to such a use and a permit is issued to such effect their actions are within the statutory grant of authority of KRS 11.020 and KRS Chapters 42, 45 and 56.

By this result we afford the Commonwealth's chief executive a necessary measure of discretion over the private chambers of the mansion in accordance with a reasonable interpretation of the broad language found in the cited statutes while reserving to the legislature the right at some future date to modify that discretion through statutory dictate.

The judgment of the Franklin Circuit Court is affirmed.

All concur.