562 S.E.2d 623

STATE of South Carolina ex rel. Charlie CONDON,
Attorney General, Plaintiff,

v.

James H. HODGES, Governor, State of South Carolina; James
A. Lander, Comptroller General and Grady L. Patterson,
Jr., State Treasurer, Defendants,

and

Glenn F. McConnell, President Pro Tempore of the South Car-
olina Senate, Hugh K. Leatherman, Sr., Chairman of the Fi-
nance Committee of the South Carolina Senate, David H.
Wilkins, Speaker of the South Carolina House of Representa-
tives and Robert W. Harrell, Jr., Chairman of the Ways and
Means Committee of the South Carolina House of Representa-
tives, Intervenors.

No. 25451.

Supreme Court of South Carolina.

Heard Feb. 21, 2002.
Decided April 18, 2002.

234

Attorney General Charles M. Condon, Deputy Attorney General Treva Ashworth, Assistant Deputy Attorney General Robert D. Cook, and Assistant Deputy Attorney General J. Emory Smith, Jr., all of Columbia, for plaintiff.

Dwight F. Drake and C. Mitchell Brown, both of Nelson, Mullins, Riley & Scarborough, of Columbia, and Stephen P. Bates, Chief Legal Counsel to the Governor, of Columbia, for defendants.

H. Pierce McNair, Jr., and Helen Ann S. Thrower, both of Columbia, for Intervenor South Carolina House of Representatives.

Michael R. Hitchcock and Geoffrey R. Penland, both of Columbia, for Intervenor South Carolina Senate.

James E. Smith, Jr., of Smith, Ellis & Stuckey, of Columbia, for Amici Curiae Douglas Jennings, Jr., John L. Scott, Jr., J. Anne Parks, Vida O. Miller, Walton J. McLeod, Herb Kirsh and Mack T. Hines, Officers for and of the House Democratic Caucus.

Justice MOORE.

We accepted this matter in our original jurisdiction to determine whether the Attorney General has the authority to bring an action against the Governor, whether a separation of powers violation has occurred, and whether the Governor is required to return a balanced budget to the General Assembly.

## FACTS

This action was commenced by the plaintiff (hereinafter referred to as the Attorney General). Thereafter, a request to intervene by certain Senators and Representatives of the General Assembly was granted. An *amicus curiae* brief on behalf of the Officers of the House Democratic Caucus was permitted to be filed.

The General Assembly passed Act 66, R.147, H.3687, the 2001 General Appropriations Act (Appropriations Act), on June 21, 2001. The General Assembly provided for base-line reductions to the recurring budgets of the State's colleges and universities. In Part 1B, Proviso 72.109 of the Appropriations Act, the General Assembly ordered the State Treasurer to transfer $38,500,000 from the Extended Care Maintenance Fund (Barnwell Fund),[1] in varying amounts, to the colleges and universities. The General Assembly's appropriation from the Barnwell Fund reduced the impact of the base-line reductions on the various colleges and universities.

On June 27, 2001, the Governor delivered his veto message regarding the Appropriations Act. This message contained vetoes of the specific base-line reductions to the recurring budgets of each of the state colleges and universities.[2] The budgets of the colleges and universities were thus returned to their prior year funding level. The effect of the vetoes was to create new expenditures in the approximate amount of $88,000,000. Despite the reduction in spending through other vetoes, the expenditures established by the Governor's vetoes of the base-line reductions to the schools' recurring budgets left the state budget approximately $23,000,000 out of balance.

---

**1.** S.C.Code Ann. § 13–7–10(11), which is part of the Atomic Energy and Radiation Control Act, provides:

> *"Extended care maintenance fund"* means the "escrow fund for perpetual care" that is used for custodial, surveillance, and maintenance costs during the period of institutional control and any post-closure observation period specified by the Department of Health and Environmental Control, and for activities associated with the closure of the site . . .

(Supp.2001).

**2.** The legality of the Governor's vetoes is not being challenged.

To remedy this imbalance, the Governor included a statement in his veto message indicating that certain colleges and universities had agreed to return a total of $28,500,000 in funds appropriated pursuant to Proviso 72.109 of the Appropriations Act.[3] The statement reads:

Since I have vetoed the base budget reductions to higher education, the supplemental appropriations contained in Proviso 72.109 are not necessary to reduce the cuts. These appropriations, however, must be reduced in order to balance the state budget. I have not vetoed these items because the colleges and universities have agreed to return these amounts to the general fund to accomplish this purpose.

Proviso 72.109 was not vetoed by the Governor for the above stated reason.[4]

On June 28, 2001, the South Carolina House of Representatives sustained the Governor's vetoes to the base-line reductions to the budgets of the colleges and universities. The provisions of the Appropriations Act became law, including Proviso 72.109. Pursuant to Proviso 72.109, money was transferred from the Barnwell Fund to the colleges and universities on July 2, 2001. However, previously on June 26th, defendants, through the Commission on Higher Education, had requested the return of the Barnwell funds. Accordingly, on July 2, 2001, a transfer of $28,500,000 was made from the accounts of the colleges and universities to the General Fund in an account in the Governor's office.

## ISSUES

I. Whether the Attorney General has authority to bring suit against the governor?

---

**3.** The Governor did not request any transfer of money in the case where funds had been specifically designated by the General Assembly to be spent for a certain purpose by a college or university.

**4.** Due to the Governor's veto message, the net result in educational and general operating funding to higher education is that, rather than the schools facing a $38.6 million reduction in operating funds, the schools would share in about a $1.9 million overall increase in operating funds over the previous year's funding level. Also, as a result of the Governor's actions, all higher education operating funds would be in recurring dollars.

II. Whether a separation of powers violation has occurred?

III. Whether the Governor is required to send a balanced budget to the General Assembly?

### ISSUE I

Defendants argue the Attorney General is violating the South Carolina Constitution and the South Carolina Code by suing the Governor in his official capacity.

S.C. Const. Art. IV, § 15, provides:

> The Governor shall take care that the laws be faithfully executed. To this end, the *Attorney General shall assist and represent the Governor, but such power shall not be construed to authorize any action or proceeding against the General Assembly or the Supreme Court.*

(Emphasis added).

█ The Attorney General argues the only restriction imposed by Art. IV, § 15, is that the Attorney General cannot bring suit against the General Assembly and the Supreme Court. He claims had a restriction been intended for suits against the Governor, such a restriction would have been included in the section. He cites to *Hodges v. Rainey,* 341 S.C. 79, 533 S.E.2d 578 (2000), for the proposition, *"expressio unius est exclusio alterius"* or *"inclusio unius est exclusio alterius,"* i.e., "to express or include one thing implies the exclusion of another, or of the alternative." The Attorney General misconstrues the constitutional provision. There is no reason for the provision to mention suits against the Governor because it is concerned with the Attorney General, *through his assistance and representation of the Governor,* bringing actions *on the Governor's behalf,* against the other branches of government. In any event, there are other authorities which lead to the conclusion that the Attorney General is not prohibited from bringing an action against the Governor.

█ The General Assembly has elaborated on the Attorney General's duties in several statutes. First, pursuant to S.C.Code Ann. § 1–7–40 (Supp.2001), the Attorney General must

appear for the State in the Supreme Court and the court of appeals in the trial and argument of all causes, criminal and civil, in which the State is a party or interested, and in these causes in any other court or tribunal when required by the Governor or either branch of the General Assembly.

The State is an interested party in this action. The way in which public funds are handled and whether a violation of the separation of powers doctrine has occurred are clearly questions in which the State has an interest. By bringing the action against the Governor, the Attorney General is simply doing what the statute allows, which is to appear for the State before the Supreme Court in the trial and argument of a cause in which the State is interested.

■ The General Assembly has also provided that the Attorney General, upon written request of a State officer has a duty to appear and defend that officer when the officer is being prosecuted in a civil or criminal action, or other special proceeding, due to an act done or omitted in good faith in the course of employment. S.C.Code Ann. § 1–7–50 (1986).[5] The Attorney General also must "give his opinion upon questions of law submitted to him by either branch" of the General Assembly or by the Governor. S.C.Code Ann. § 1–7–90 (1986).

There is no provision in the South Carolina Code or Constitution that explicitly prevents the Attorney General from bringing a civil action against the Governor. Further,

"[a]s the chief law officer of the State, [the Attorney General] may, in the absence of some express legislative restriction to the contrary, exercise all such *power* and *authority as public interests may from time to time require,* and may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights.*"

---

5. Defendants argue the Attorney General's action of suing the Governor is invalid because the Governor made a written request that the Attorney General dismiss the suit. However, the Governor never requested that the Attorney General represent him in this matter; therefore, the Attorney General has not violated section 1–7–50.

*State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd* 282 U.S. 187, 51 S.Ct. 94, 75 L.Ed. 287 (1930) (citation omitted and italics added by *Daniel* court). *Cf. State v. Beach Co.*, 271 S.C. 425, 248 S.E.2d 115 (1978) (while Attorney General has broad statutory authority, and arguably common law authority, to institute actions involving welfare of State, that authority is not unlimited).

The Attorney General has a dual role. He is an attorney for the Governor and he is an attorney for vindicating wrongs against the collective citizens of the State. *See Porcher v. Cappelmann*, 187 S.C. 491, 198 S.E. 8 (1938) (Attorney General represents sovereign power and general public). Allowing the Attorney General to bring an action against the Governor when there is the possibility the Governor is acting illegally is consistent with the duties of this dual role. Further, because the office of attorney general exists to properly ensure the administration of the laws of this State, the Attorney General is merely ensuring that Proviso 72.109 is being administered the way in which the General Assembly intended. *See Langford v. McLeod*, 269 S.C. 466, 238 S.E.2d 161 (1977) (office of attorney general exists to properly ensure administration of laws of this State).

The above precepts lead to the conclusion that the Attorney General can and should bring an action against the Governor if there is the possibility the Governor is acting improperly.[6]

We note that, previously, the Attorney General has sued the Governor in the Governor's capacity as Chairman of the State Budget and Control Board. *See State ex rel. McLeod v. Riley*, 276 S.C. 323, 278 S.E.2d 612 (1981), *overruled on other grounds by WDW Properties v. City of Sumter*, 342 S.C. 6, 535 S.E.2d 631 (2000) (action to determine constitutionality of certain bond authorizations); *State ex rel. McLeod v. Edwards*, 269 S.C. 75, 236 S.E.2d 406 (1977) (action attacking

---

6. We agree with the conclusion stated in the concurring opinion that the framers of our state constitution did not intend to make the Attorney General the "arbiter" of whether the Governor is faithfully executing the laws. The Attorney General cannot be the arbiter because that is, in fact, the duty of this Court. However, contrary to the belief stated in the concurring opinion, we conclude the Attorney General can and should bring to our attention alleged violations of the separation of powers doctrine.

constitutionality of legislation which created State Budget and Control Board). *See also State ex rel. McLeod v. Martin,* 274 S.C. 106, 262 S.E.2d 404 (1980) (action brought by Attorney General and Governor challenging legislation creating Court of Appeals). However, the Attorney General's authority to sue the Governor was not raised and remains a novel issue in this State. Subsequently, in *State ex rel McLeod v. McInnis,* 278 S.C. 307, 295 S.E.2d 633 (1982), the Court noted that the Attorney General's right to bring the action involved in *Martin* and *Edwards* was not directly attacked. The *McInnis* court stated, however, that

> [t]he Attorney General, by bringing this action in the name of the State, speaks for all of its citizens and may, on their behalf, bring to the Court's attention for adjudication charges that there is an infringement in the separation-of-powers area.[7]

From this language and the fact there is no statutory or constitutional prohibition against the Attorney General suing the Governor, we find the Attorney General has the authority to sue the Governor when he is bringing the action in the name of the State for the purpose of asserting that a separation of powers violation has occurred. Moreover, as stated previously, the Attorney General can bring an action against the Governor when it is necessary for the enforcement of the laws of the State, the preservation of order, and the protection of public rights.

Defendants query whether the Attorney General's action of bringing suit against the Governor violates the Rules of Professional Responsibility. Defendants state the Attorney General and the Governor have an attorney-client relationship, and that the Attorney General has violated Rule 1.7(a) of Rule 407 of the Rules of Professional Responsibility, which states "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: ... (2) Each client consents after consultation."

---

7. In *McInnis,* the Attorney General brought an action against the Joint Appropriation Review Committee, claiming the statute providing for the creation of that committee was unconstitutional because it violated the separation of powers doctrine.

Defendants contend if the Governor had requested the Attorney General represent him in this matter, the Attorney General would be required to do so. *See* S.C.Code Ann. § 1–7–50. In that event, the Attorney General would be on both sides of the action which Defendants assert is impermissible. Defendants also assert that because the Attorney General is currently representing the Governor in other legal matters, the Attorney General cannot ethically bring the instant action against the Governor.

We have previously found that an analogous situation did not create a conflict of interest. *Cf. Langford v. McLeod, supra* (original proceeding brought for declaratory judgment as to status, responsibility, and duty of Attorney General in representing municipal employees in civil actions; Court held Attorney General may represent public officials in civil suits as well as criminal ones without being subject to imposition of conflicting or unethical duties); *State ex rel. McLeod v. Snipes,* 266 S.C. 415, 223 S.E.2d 853 (1976) (Attorney General sought declaratory judgment that statute requiring him to represent officers of State in criminal proceedings was in conflict with constitutional provision designating Attorney General as chief prosecutor of State; Court held no conflict of interest arose from two duties of Attorney General as he could appoint members of his staff or solicitors or assistant solicitors to participate in prosecution and defense).

Furthermore, the Attorney General, as noted above, has a dual role of serving the sovereign of the State and the general public. Thus, the Attorney General is not violating the ethical rule against conflicts of interest by bringing an action against the Governor.

While the Attorney General is required by the Constitution to "assist and represent" the Governor, the Attorney General also has other duties given to him by the General Assembly, and elaborated on by the Court, which indicate the Attorney General can bring an action against the Governor.[8]

---

8. *See, e.g., Com. ex rel. Cowan v. Wilkinson,* 828 S.W.2d 610 (Ky.1992) (Attorney General brought action seeking to enjoin governor from being sworn in and acting as member of state university board of trustees pursuant to executive order by which Governor appointed himself to that position; court held Attorney General's motion did not meet requirements of extraordinary remedy for injunctive relief.); *In re Com.*

Accordingly, we find the Attorney General is not prohibited from bringing an action against the Governor.

## ISSUE II

At issue is whether the combined actions of members of the executive branch violated the separation of powers doctrine by having funds that the General Assembly had specifically appropriated to the schools returned to the General Fund.[9]

█ Initially, we note because Proviso 72.109 was not vetoed by the Governor, the proviso became law. *See* S.C.

---

*ex rel. Beshear*, 672 S.W.2d 675 (Ky.Ct.App.1984) (Attorney General, in official capacity and acting on behalf of state's citizens, applied for temporary restraining order and permanent injunction concerning charging of admission to members of public wishing to view publicly furnished private quarters of executive mansion; court held that Governor has discretion to permit nonprofit organization to conduct tours of private quarters of mansion for general public in exchange for monetary fee); *Fordice v. Bryan*, 651 So.2d 998 (Miss.1995) (Attorney General had standing in his official capacity to intervene, on behalf of State, in suit seeking declaratory judgment that governor's partial vetoes of 29 legislative bills were unconstitutional); *State ex rel. Douglas v. Thone*, 204 Neb. 836, 286 N.W.2d 249 (1979) (Attorney General brought action against Governor to enjoin implementation of statute which authorized plan for development of alcohol plants and facilities in Nebraska); *McGraw v. Caperton*, 191 W.Va. 528, 446 S.E.2d 921 (1994) (Attorney General brought declaratory judgment action against Governor seeking determination of his rights and responsibilities under statute requiring him to approve state contracts and ruling as to constitutionality and validity of computer contracts which were basis for computer education program; held Attorney General could not bring declaratory judgment action in official capacity because he was not a "person" for purpose of maintaining declaratory judgment action).

While none of the above cases raised the issue of whether an Attorney General has the power to bring an action against the Governor, we cite them for the proposition that the Attorney General has not been prohibited from bringing an action against the Governor in those jurisdictions.

9. Defendants argue a justiciable controversy is not presented because the schools "voluntarily remitted funds and the Defendant Treasurer and Comptroller General did nothing but place those funds, as requested in writing by the [schools], into the general fund where they cannot be spent and are under the control of the General Assembly." This issue involves a real and not a hypothetical question. The funds were requested to be returned to the General Fund and they were so returned. The question whether that action was valid remains a viable one.

Const. Art. IV, § 21 (if Governor shall not approve any one or more of items or sections contained in appropriation bill, but shall approve of residue thereof, residue shall become law in like manner as if Governor had signed it). While the Governor indicated in his veto message he was not vetoing Proviso 72.109 because the schools had agreed to return the appropriated amounts to the general fund, the veto message does not have the effect of law. *Drummond v. Beasley,* 331 S.C. 559, 503 S.E.2d 455 (1998) (governor's veto message does not have force of law because it is not a legislative act or an Executive Order).

 S.C. Const. Art. I, § 8, provides:

In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.

As stated by the Court in *State ex rel. McLeod v. McInnis:*

One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.

278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982).

 The General Assembly, as part of its law-making responsibilities, has

the duty and authority to appropriate money as necessary for the operation of the agencies of government and has the right to specify the conditions under which the appropriated monies shall be spent. This the Assembly traditionally does by way of the annual State Appropriations Bill.

*Id.* at 313–314, 295 S.E.2d at 637. *See also Gilstrap v. South Carolina Budget and Control Bd.,* 310 S.C. 210, 423 S.E.2d 101 (1992) (appropriation of public funds is a legislative function); *Clarke v. South Carolina Pub. Serv. Auth.,* 177 S.C. 427, 181 S.E. 481 (1935) (General Assembly has full authority to

make such appropriations as it deems wise in absence of any specific constitutional prohibition against such appropriation).

 Accordingly, the General Assembly properly appropriated money from the Barnwell Fund to the colleges and universities through Proviso 72.109. The question is whether the concerted efforts of members of the executive branch encroached upon this power by having appropriated funds transferred from the schools to the General Fund. We conclude the General Assembly's power has been encroached upon.

One of the Governor's duties, as chairman of the State Budget and Control Board, is to submit a recommended state budget to the General Assembly. *See* S.C.Code Ann. § 1–11–10 (Supp.2001) (Governor is chairman of State Budget and Control Board); S.C.Code Ann. § 11–11–15 (Supp.2001) (functions of State Budget and Control Board in preparation and submission to General Assembly of recommended state budget are devolved upon Governor).

The Governor has the ability, after the General Assembly has passed an appropriation act, of vetoing items or sections contained within the act. S.C. Const. Art. IV, § 21. If he vetoes any items or sections, the General Assembly, within each house, has the ability to override the Governor's vetoes by having the requisite number of votes to do so. *Id.*

However, there is no provision in the South Carolina Code or Constitution which provides that the members of the executive branch have the ability to transfer funds from those to whom the General Assembly has appropriated money. In fact, there is clear legislative intent that the ability to transfer appropriated money will lie only with the General Assembly. *See* S.C.Code Ann. § 11–9–10 (1986) ("It shall be unlawful for any moneys to be expended for any purpose or activity except that for which it is specifically appropriated, and *no transfer from one appropriation account to another shall be made unless such transfer be provided for in the annual appropriation act.*") (emphasis added); S.C.Code Ann. § 11–9–20(A) (Supp.2001) ("It is *unlawful* for an officer, clerk, or other person charged with disbursements of state funds appropriated by the General Assembly to exceed the amounts and purposes stated in the appropriations, or *to change or shift*

*appropriations from one item to another. Transfers may be authorized by the General Assembly in the annual appropriation act for the State."*) (emphasis added).

Furthermore, the General Assembly cannot delegate this legislative power even if it so desired. *See Gilstrap v. South Carolina Budget and Control Bd., supra* (General Assembly may not delegate its power to make laws); *State ex rel. McLeod v. McInnis, supra* (General Assembly's attempt to delegate to Joint Appropriations Review Committee power to control expenditure of state and federal funds was found to violate separation of powers because committee was permitted to control expenditures by administration rather than by legislation); *Bauer v. South Carolina State Housing Auth.,* 271 S.C. 219, 246 S.E.2d 869 (1978) (non-delegation doctrine is based on the constitutional requirement that branches of government be forever separate and distinct from each other).

Therefore, the authority to transfer appropriated money lies with the General Assembly and not the executive branch.[10]

Because Proviso 72.109 was not vetoed, the Governor and other members of the executive branch were required to faithfully execute that proviso. S.C. Const. Art. IV, § 14 (Governor shall take care that the laws be faithfully executed). Instead, the proviso was undermined by the combined actions of certain members of the executive branch by transferring funds that had been appropriated to the schools to the General Fund.

---

**10.** *See also Rios v. Symington,* 172 Ariz. 3, 833 P.2d 20 (1992) (governor, in veto message to legislature, instructed various state agencies to revert specified sums of money to general fund for purpose of bringing total budget into balance; court held governor had exceeded his power); *Colorado General Assembly v. Lamm,* 700 P.2d 508 (Colo.1985) (executive branch's action of transferring appropriated funds from particular executive departments to others impermissibly infringed upon General Assembly's plenary power of appropriation; also noting challenged transfers dramatically altered objectives which General Assembly had determined were to be achieved through use of state funds); *County of Cook v. Ogilvie,* 50 Ill.2d 379, 280 N.E.2d 224 (1972) (statute providing that State Department of Public Aid, with consent of governor, may reapportion amounts appropriated under Public Aid Code among several subdivisions of public aid as need arises was an unconstitutional delegation of legislative power to executive branch).

 We emphasize that the Governor's simple request to the schools that they return the appropriated funds does not in and of itself violate the separation of powers doctrine. However, given the concerted effort of the Governor, the Comptroller General, and the State Treasurer to transfer the appropriated funds to the General Fund, we find the actions of the executive branch have resulted in a separation of powers violation.[11]

## ISSUE III

 At issue is whether the Governor has a responsibility either to sign into law a balanced budget passed by the General Assembly or exercise his veto authority in a manner that maintains a balanced budget.

S.C. Const. Art. X, § 7(a), provides: "The General Assembly shall provide by law for a budget process to insure that annual expenditures of state government may not exceed annual state revenue." Therefore, the General Assembly is constitutionally required to ensure that the budget process results in a balanced budget. However, there is no provision in the South Carolina Code or Constitution which states the Governor is required to return a balanced budget to the General Assembly. There is also no requirement that the Governor exercise his veto power in a manner that will ensure a balanced budget. *See, e.g.,* S.C. Const. Art. III, § 36; S.C. Const. Art. IV, § 21; S.C. Const. Art. X, § 7.

---

**11.** The State further argues the Governor has violated S.C.Code Ann. § 11–9–10 (1986), which provides that "no transfer from one appropriation account to another shall be made unless such transfer be provided for in the annual appropriation act." Defendants argue section 11–9–10 was not violated because the returned funds were not placed in an appropriation account but, rather, were placed in a revenue account. Regardless of this fact, the statute has been violated.

From a reading of section 11–9–10 and from S.C.Code Ann. § 11–9–20(a), which provides that it is unlawful for one "charged with disbursements of state funds appropriated by the General Assembly ... to change or shift appropriations from one item to another," and which provides that "[t]ransfers may be authorized by the General Assembly in annual appropriation act ...," there is clear legislative intent to ensure that appropriated funds are not expended for any other purpose other than for which the funds were appropriated.

Accordingly, we find the Governor is not required to return a balanced budget to the General Assembly.

## CONCLUSION

We conclude the Attorney General is not prohibited by the South Carolina Constitution or Code from bringing a legal action against the Governor. Further, we find that the executive branch's actions have resulted in a separation of powers violation. Finally, we find the Governor is not required by the South Carolina Code or Constitution to return a balanced budget to the General Assembly.

TOAL, C.J., and WALLER, J., concur. BURNETT, J., concurring in a separate opinion. PLEICONES, J., concurring in a separate opinion.

Justice BURNETT: (Concurring).

I concur with the conclusions reached by the majority opinion. I write separately because the majority bases the separation of powers violation on the "concerted efforts" of members of the executive branch. It is not disputed the events culminating in this constitutional violation were precipitated by a "request" from the Governor.

South Carolina Constitution Article I, § 8, provides:

In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.

The separation of powers mandate is followed by the delineation of powers, authority and functions of each branch of government. Article III, § 1 provides the legislative power of this State shall be vested in ... the "General Assembly of the State of South Carolina."

The majority explains the General Assembly has "the duty and authority to appropriate money as necessary for the operation of the agencies of government and has the right to specify the conditions under which the appropriated monies shall be spent. This the Assembly traditionally does by way of the annual State Appropriations Bill." *State ex rel. McLeod*

*v. McInnis,* 278 S.C. at 312, 313–14, 295 S.E.2d 633, 637 (1982).

Upon passage of an appropriations bill, the authority of the Governor extends to approving or vetoing items or sections of the bill. S.C. Const. Art. IV, § 21. The majority acknowledges South Carolina Code Ann. § 11–9–10 (1986) prohibits the expenditure of any monies for any purpose other than that for which the monies were appropriated and "no transfer from one appropriation account to' another shall be made unless such transfer be provided for in the annual appropriation act." No authority to transfer the colleges and universities' funds was authorized in the 2001–2002 Appropriation Act.

Through Article IV, § 1, the "supreme executive authority" of South Carolina is vested in the "Chief Magistrate," the "Governor of the State of South Carolina." A "simple request" from "the supreme executive authority" of South Carolina issued to an agency with the purpose of effecting changes in the appropriations act violates Article I, § 8. The "request" of the Governor is inconsistent with the "right and duty of the legislature to determine the appropriations of agencies and the programs undertaken." *State ex rel. McLeod v. McInnis, supra* 278 S.C. at 314, 295 S.E.2d at 637.

The majority's conclusion of a separation of powers violation appears to rest on the "concerted efforts" of members of the executive branch. Although this conclusion is correct, in my view, it is not merely the "concerted effort" of members of the executive branch which effects the violation of Article I, § 8, but it is the act of any member of the executive branch which effects an infringement of the legislative authority and duty to appropriate money. *Id.*

Justice PLEICONES:

I agree with the majority that the transfer of funds from the colleges and universities to the state treasurer contravened the budget process. I also agree that the governor is not required to exercise his veto power to effectuate a balanced budget. I write separately because I would pursue a different path in arriving at this result.

I have grave reservations regarding the majority's decision which allows the attorney general to sue the governor, espe-

cially where the issue is whether one branch of government has encroached on the powers of another branch. The attorney general is the governor's legal representative, and the office of attorney general is part of the executive branch of government. *See* S.C.Code Ann. § 1–1–110 (Supp.2001) (office of attorney general is part of the executive department).

Here, the governor maintains that he has faithfully executed [12] the laws of the state. I do not believe the framers of our state constitution intended to make the attorney general the arbiter of whether his client, the governor, is or is not faithfully executing the law.

This case presents a separation of powers question and should be viewed only in that context. The branch of government aggrieved by the transfer of funds, the General Assembly, is a party to this suit, and is ably represented by its own counsel. In my opinion the Court need not address whether the attorney general may, consonant with the state constitution, ever bring suit against the governor. No one disputes that the General Assembly has the authority to maintain this action. The General Assembly is properly before this Court, and raises the same issues as the attorney general. I would not decide the constitutional issue of the attorney general's authority to initiate an action against the governor because that decision is not necessary to the determination of this dispute.[13]

As to the governor's personal involvement in the transfers, the undisputed facts establish that the governor merely requested the colleges and universities return certain funds to the general fund. The schools complied with the request. The governor neither transferred funds, nor ordered any entity to transfer funds. *Cf. Drummond v. Beasley*, 331 S.C. 559, 503 S.E.2d 455 (1998) (governor's veto message does not have force of law). In my opinion the governor, like the attorney general, should be dismissed from this action.

---

**12.** The state constitution provides that "[t]he Governor shall take care that the laws be faithfully executed...." S.C. Const. Art. IV, § 15.

**13.** *See State v. Owens*, 346 S.C. 637, 552 S.E.2d 745 (2001).