# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

South Carolina Public Interest Foundation and John Crangle, individually and on behalf of all others similarly situated, Appellants,

v.

Alan Wilson, Attorney General for the State of South Carolina; Willoughby & Hoefer, P.A.; and Davidson & Wren, P.A., f/k/a Davidson, Wren & DeMasters, P.A., Respondents.

Appellate Case No. 2024-000065

———————

Appeal from Richland County
Daniel Coble, Circuit Court Judge

———————

Opinion No. 28307
Heard April 2, 2025 – Filed November 12, 2025

———————

**AFFIRMED IN RESULT**

———————

James Mixon Griffin, Badge Humphries, and Margaret Nicole Fox, all of Griffin Humphries LLC, of Columbia, and James G. Carpenter, of The Carpenter Law Firm, of Greenville, for Appellants.

John S. Simmons, of Simmons Law Firm, LLC, of Columbia, Gerald Malloy, of Malloy Law Firm, of Hartsville, and James Todd Rutherford, of Rutherford Law Firm, LLC, of Columbia, for Respondent Willoughby & Hoefer, P.A.; William H. Davidson II and Kenneth P.

Woodington, both of Davidson & Wren, P.A., of Columbia, for Respondent Davidson & Wren, P.A., f/k/a Davidson, Wren & DeMasters, P.A.; Attorney General Alan McCrory Wilson, Solicitor General Robert D. Cook, and Deputy Solicitor General J. Emory Smith, Jr., all of Columbia, for Respondent Alan Wilson.

---

**JUSTICE JAMES:** In this case, we address the South Carolina Attorney General's authority to enter into contingent fee agreements with private law firms. Attorney General Alan Wilson retained Willoughby & Hoefer, P.A. (W&H) and Davidson & Wren, P.A. (D&W), f/k/a Davidson, Wren & DeMasters, P.A., (collectively, the Law Firms) to represent the State in litigation against the United States Department of Energy (DOE) involving "defense plutonium or defense plutonium materials" the DOE transported into the State beginning in 2002. In 2016, Wilson and the Law Firms executed a fee agreement (amended in 2019), which provided the Law Firms would be paid on a sliding scale contingent fee basis. After the DOE paid the State $600 million to settle the case, Wilson transferred $75 million in attorney's fees to the Law Firms. Appellants challenged the transfer in the circuit court, which dismissed the case, finding Appellants did not have standing. In 2022, we held Appellants had public importance standing and remanded the case to the circuit court "to consider the merits of Appellants' claims." *S.C. Pub. Int. Found. v. Wilson*, 437 S.C. 334, 343, 878 S.E.2d 891, 896 (2022). Upon remand, the circuit court granted summary judgment to Wilson and the Law Firms, ruling Wilson had the threshold authority to enter into the fee agreements. Even though the circuit court did not address the merits of all of Appellants' claims, the claims present only questions of law. Therefore, we will address those claims.

Subsection 1-7-150(B) of the South Carolina Code is at the center of this dispute. It provides:

> All monies, except investigative costs or *costs of litigation awarded by court order or settlement*, awarded the State of South Carolina by judgment or settlement in actions or claims brought by the Attorney General on behalf of the State or one of its agencies or departments *must be deposited in the general fund of the State*, except for monies recovered for losses or damages to natural resources, which must be deposited in the Mitigation Trust Fund, *or where some other disposition is required by law*.

S.C. Code Ann. § 1-7-150(B) (2005) (emphasis added). Appellants concede the term "costs of litigation" includes attorney's fees, and they concede the Attorney General has the authority to enter into contingent fee agreements with private law firms. However, harkening to subsection 1-7-150(B), Appellants argue that because the fees were not awarded "by court order or settlement," the entire $600 million settlement must be deposited into the general fund of the State or into a legislatively-created Litigation Recovery Account (LRA)[1] before attorney's fees can be paid. According to Appellants, payment of a fee to the Law Firms would then be at the discretion of the General Assembly. Wilson contends his office has the authority to transfer the fees to the Law Firms without the gross settlement proceeds first being deposited into the general fund or the LRA. We agree with Wilson and affirm the circuit court in result.

## I.

## A.

In 2002, South Carolina reached an agreement with the DOE concerning the storage and removal of weapons-grade (also referred to as "defense" or "weapons-usable") plutonium at the Savannah River Site in Aiken, South Carolina. To that end, Congress enacted 50 U.S.C. § 2566, entitled "Disposition of weapons-usable plutonium at Savannah River Site." Among other things, the legislation summarized plans for the DOE's construction and operation of a mixed-oxide (MOX) fuel fabrication facility at the Savannah River Site and

---

[1] Proviso 59.8 of the 2019-2020 Appropriations Act provided the following:

> (AG: Litigation Recovery Account) During the current fiscal year, when there is a recovery or an award in any litigation managed by the Attorney General, any funds received that would have otherwise been credited to the General Fund shall be deposited to the credit of a special account created in the Office of State Treasurer entitled "Litigation Recovery Account." The funds deposited in this account must be expended only as prescribed by law.

H. 4000, 123rd Leg., 1st Reg. Sess. (S.C. 2019). The effect of Proviso 59.8 was extended into the 2020-2021 fiscal year. H. 3411, 123rd Leg., 2nd Reg. Sess. (S.C. 2020) ("The effective dates of Parts IA and IB of [the 2019-2020 Appropriations Act] are extended until the effective date for appropriations made in a general appropriations act for Fiscal Year 2020-2021 . . . .").

provided the State could collect economic and impact assistance payments should the DOE fail to achieve the mixed-oxide production objective by January 1, 2016. § 2566(a)(1), (d), (h). Specifically, the legislation provided that if the MOX production objective was not achieved by January 1, 2016, the DOE would make economic and impact assistance payments to the State not to exceed $100 million per year beginning in 2016 and going through 2021, until either the MOX production objective was achieved or the DOE removed from South Carolina at least one metric ton of defense plutonium or defense plutonium materials—whichever happened later. § 2566(d)(1). If, as of January 1, 2022, the MOX facility had not processed certain amounts of fuel, the DOE would pay additional economic and impact assistance payments not to exceed $100 million per year until the removal of a certain amount of defense plutonium or defense plutonium materials. § 2566(d)(2). Unfortunately for South Carolina, Congress amended the legislation in 2005 to provide that the DOE's obligation to make the economic and impact assistance payments was "subject to the availability of appropriations" by Congress. § 2566(d)(1). And behold, Congress did not appropriate funds for these statutory payments during the years relevant to this case.

Wilson retained the Law Firms to protect the State's interests with respect to the DOE's obligations, and in 2014, the State learned the DOE was preparing to place the MOX facility in "cold standby" status, which the State feared would effectively terminate the MOX project. When the DOE failed to meet the MOX production objective by the legislated target date of January 1, 2016, then-Governor Nikki Haley requested Wilson to sue the DOE. Wilson and the Law Firms entered into a litigation retention agreement (Fee Agreement) in February 2016, which provided for the reimbursement of certain costs and contained sliding-scale contingency fee schedules based on the amount of gross recovery, the type of representation provided, and the courts in which matters were heard. The Fee Agreement also provided, "When possible, the attorneys' fees and costs awarded to [the Law Firms] shall be approved by a Court of competent jurisdiction." The Fee Agreement was amended in 2019 and included modified sliding-scale contingency fee schedules based on considerations similar to those in the initial Fee Agreement.

**B.**

In February 2016, the State—represented by the Law Firms—sued the DOE in federal district court in South Carolina, stating claims for money damages and injunctive relief. The district court dismissed the damages claim for lack of subject matter jurisdiction, but it granted injunctive relief and ordered the DOE to remove one metric ton of plutonium from the Savannah River Site by December 31, 2019. *See South Carolina v. United States*, No. 1:16-CV-00391-JMC, 2017 WL 976298

(D.S.C. Mar. 14, 2017); *South Carolina v. United States*, No. 1:16-CV-00391-JMC, 2017 WL 491696 (D.S.C. Feb. 7, 2017). The DOE appealed, and the Fourth Circuit affirmed. *See South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018).

As ordered by the district court, the DOE removed one metric ton of plutonium, and that plutonium was slated for transport to a facility in Nevada. On November 30, 2018, the State of Nevada sued the DOE in federal district court in Nevada, seeking to block the shipment. Because the Nevada facility was one of just a few facilities capable of storing defense plutonium, Wilson was concerned (1) there would be additional delay in the removal of the plutonium from the Savannah River Site and (2) the DOE would successfully raise an impossibility defense to its South Carolina obligations if Nevada were successful in rejecting the plutonium. The Law Firms, on behalf of the State of South Carolina, moved to intervene in the Nevada litigation, and the district court granted the motion. The district court denied Nevada's motion for a preliminary injunction. *See Nevada v. United States*, 364 F. Supp. 3d 1146 (D. Nev. 2019). Nevada appealed to the Ninth Circuit, which eventually dismissed the appeal as moot. *See Nevada v. United States*, 783 F. App'x 700 (9th Cir. 2019). After further procedural wrangling, South Carolina's involvement in the Nevada case ended with concessions made in South Carolina's favor, and Nevada and the DOE settled the dispute between them. In August 2019, the DOE filed a declaration with the district court in South Carolina stating it had completed the previously-ordered removal of one metric ton of plutonium from the Savannah River Site.

In January 2018, the State, represented by W&H, sued the DOE in the United States Court of Federal Claims (COFC) for economic and impact assistance payments due under 50 U.S.C. § 2566 for the year 2016. In March 2018, the State amended its complaint to add a claim for the $100 million of economic and impact assistance payments for the year 2017. The DOE moved for summary judgment, arguing that because Congress had not appropriated funds for the payments, its obligation was nil. The COFC granted the motion.[2] *See South Carolina v. United*

---

[2] Around this time, Wilson learned the DOE was planning to abandon construction of the MOX facility. While the DOE's summary judgment motion was pending before the COFC, the State—represented by W&H—filed a separate suit in the District of South Carolina to enjoin the DOE from abandoning the project. The district court granted the State's motion for preliminary injunction, but the Fourth Circuit held the State lacked standing and vacated the preliminary injunction. *See South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019), *cert. denied*, 589 U.S. 1015 (2019).

*States*, 144 Fed. Cl. 277 (2019). The State appealed, and during settlement discussions, the United States Court of Appeals for the Federal Circuit stayed the appeal. By 2020, the total economic and impact assistance obligation of the DOE had grown by another $200 million ($100 million for 2018 and $100 million for 2019). In August 2020, the parties executed a settlement agreement (Settlement Agreement), which provided for payment of not only the $400 million due for 2016-2019, but also another $200 million. The Settlement Agreement required DOE to pay $600 million to the State, "inclusive of interest, with each party to bear its own costs, attorney fees, and expenses." The State agreed to forego further legal action against the DOE until January 1, 2037, at which time the Settlement Agreement would govern the State's rights and remedies.

Approximately one month after the Settlement Agreement was signed (but before the money was paid to the State), Wilson and the U.S. Department of Justice entered into an "Agreement to Voluntary Dismissal of Appeal." That instrument was filed with the Court of Appeals for the Federal Circuit and acknowledged the Settlement Agreement required the United States to make an immediate payment of $600 million to South Carolina. It further provided the payment was "inclusive of amounts for interest and the State's attorneys' fees and other costs, *which are reimbursed and awarded from payment of the settlement amount*, and the State shall have no further claim against the United States for such fees and costs." (emphasis added).

## C.

Wilson publicly announced he would pay the Law Firms $75 million in attorney's fees pursuant to the Fee Agreement. Appellants commenced this action against Wilson for declaratory and injunctive relief. Appellants alleged that because attorney's fees were not "awarded by court order or settlement" as contemplated in South Carolina Code subsection 1-7-150(B), the entire $600 million had to be deposited into the State's general fund. Appellants also alleged the fee amount was patently unreasonable and required court approval.

When Appellants learned Wilson had already disbursed the disputed fees to the Law Firms, Appellants amended their complaint to name the Law Firms as defendants and filed another motion for preliminary injunction. The circuit court found Appellants lacked public importance standing, denied the motion for injunctive relief, and dismissed Appellants' complaint. Appellants appealed, and in 2022, this Court held Appellants had public importance standing and remanded to the circuit court to "consider the merits of Appellants' claims." *S.C. Pub. Int. Found.*, 437 S.C. at 343, 878 S.E.2d at 896.

Even though Appellants raised multiple claims in their pleadings, and even though our remand instructions directed the circuit court to rule on the merits of Appellants' claims, the circuit court erroneously concluded the scope of remand was limited to the threshold issue of whether the Attorney General has authority to enter into fee agreements. The circuit court denied Appellants' request to conduct discovery and granted summary judgment to Wilson and the Law Firms, ruling South Carolina Code subsection 1-7-150(B) authorizes the Attorney General to enter into contingent fee agreements with private law firms. Appellants appealed, and this Court certified the case for review. As we will discuss, even though the circuit court did not rule on the merits of all of Appellants' claims, the record before us is sufficient for us to rule on those claims as a matter of law.

## II.

Appellants do not challenge the Attorney General's authority to enter into contingent fee agreements with private law firms. Indeed, no provision of law prohibits the Attorney General from doing so, and it has long been common practice for the Attorney General to do so when complex litigation is on the horizon. However, Appellants contend that, because the fees in this case were not awarded by court order or settlement, subsection 1-7-150(B) requires the gross settlement proceeds to be deposited into the general fund or the LRA. Appellants argue the payment of attorney's fees would then be in the sole discretion of the General Assembly. Alternatively, Appellants argue that even if Wilson may pay the fees directly to the Law Firms, we should remand to the circuit court the issue of the overall reasonableness of the fees. Of course, Wilson and the Law Firms disagree.

## III.

"The interpretation of a statute is a question of law." *Sparks v. Palmetto Hardwood, Inc.*, 406 S.C. 124, 128, 750 S.E.2d 61, 63 (2013) (citing *CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011)). Again, subsection 1-7-150(B) provides:

> All monies, except investigative costs or costs of litigation awarded by court order or settlement, awarded the State of South Carolina by judgment or settlement in actions or claims brought by the Attorney General on behalf of the State or one of its agencies or departments must be deposited in the general fund of the State, except for monies recovered for losses or damages to natural resources, which must be deposited in the Mitigation Trust Fund, or where some other disposition is required by law.

S.C. Code Ann. § 1-7-150(B).  With three exceptions, this provision requires all funds received by judgment or settlement in actions brought by the Attorney General on behalf of the State to be deposited into the State's general fund.  Relevant to this case are two of those exceptions: (1) "investigative costs or costs of litigation awarded by court order or settlement" and (2) "where some other disposition is required by law."

## A. Costs of Litigation Awarded by Settlement

Section 5(a) of the Settlement Agreement in the COFC lawsuit provided for "[i]mmediate payment by the United States to the State of South Carolina in the amount of $600 Million (Six Hundred Million Dollars), inclusive of interest, with each party to bear its own costs, attorney fees, and expenses."  Critical to our analysis is the subsequent "Agreement to Voluntary Dismissal of Appeal" entered into between the Attorney General and the U.S. Department of Justice.  As noted above, that instrument acknowledged the Settlement Agreement required the United States to make an immediate payment of $600 million to South Carolina, and it further provided the payment was "inclusive of amounts for interest and the State's attorneys' fees and other costs, *which are reimbursed and awarded from payment of the settlement amount*, and the State shall have no further claim against the United States for such fees and costs."  (emphasis added).

We hold the Settlement Agreement, along with the plain language of the Agreement to Voluntary Dismissal of Appeal, "awarded" attorney's fees.  Therefore, the portion of the gross settlement representing the attorney's fee is not required to be deposited into either the State's general fund or the LRA under subsection 1-7-150(B) before the fee is paid to the Law Firms.

## B. Other Disposition Required by Law

We also hold there is "some other disposition [] required by law" allowing the fee to be paid before the balance of the gross proceeds is deposited into the general fund or the LRA.  *See* S.C. Code Ann. § 1-7-150(B) ("All monies . . . awarded the State of South Carolina by judgment or settlement in actions or claims brought by the Attorney General on behalf of the State . . . must be deposited in the general fund of the State, except . . . where some other disposition is required by law.").  On occasion, settlement proceeds are paid to the State without the State having retained a private law firm, and that money must be deposited into the general fund or the LRA.  However, as Appellants concede, the Attorney General has the authority to

enter into contingent fee agreements with private law firms when the need arises.[3] Therefore, the Fee Agreement is necessarily a valid contract between the Attorney General and the Law Firms. The enforcement of a valid contract is required by law. *See Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994). It would be absurd for us to conclude the Attorney General has the authority to enter into a contingent fee agreement with a private law firm but not permit the Attorney General to perform a plainly-stated contractual obligation to pay the fee to the retained law firm. Put another way, it would be absurd to permit the Attorney General to enter into a valid contract with a law firm but then have payment of the agreed-upon fee be at the discretion of another branch of government—here, the General Assembly— that is a stranger to the contract. Consequently, we hold Wilson's contractual obligation to pay the fee constitutes "some other disposition [] required by law" under subsection 1-7-150(B); thus, the gross settlement funds need not be deposited into the general fund or the LRA.

## IV.

### A.

Appellants contend that even if the Court determines the Attorney General may pay a contingency fee to the Law Firms before the balance of the settlement is deposited into the general fund or the LRA, the Court should remand this case to the

---

[3] The rules governing lawyer conduct implemented by this Court address representation agreements between lawyers and their clients: "The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing . . . ." Rule 1.5(b), RPC, Rule 407, SCACR. With respect to contingency fees, the rules require a written agreement:

> A fee may be contingent on the outcome of the matter for which the service is rendered . . . . A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated.

Rule 1.5(c), RPC, Rule 407, SCACR. The Fee Agreement complies with this Rule.

circuit court for a determination of the reasonableness of the fee. On that point, Appellants contend a portion (either $400 million, as claimed by Appellants during oral argument, or $200 million, as claimed by Appellants in their brief) of the $600 million settlement was not recovery of economic and impact assistance due under 50 U.S.C. § 2566, but rather represents "rent" paid by the DOE for continued storage of plutonium at the Savannah River Site until 2037. Appellants contend the Law Firms are not entitled to a fee for the payment of such rent and that we should remand to the circuit court for a determination of what sums were paid by the DOE in the form of economic and impact assistance payments and what sums were rent.

Respondents contend such an inquiry by the courts would violate the separation of powers provision set forth in article I, section 8 of the South Carolina Constitution:

> In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.

S.C. Const. art. I, § 8. As we noted in *State ex rel. Condon v. Hodges*,

> One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.

349 S.C. 232, 244, 562 S.E.2d 623, 630 (2002) (quoting *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982)). Adherence to article I, section 8 does not mean courts can shy away from their duty to interpret statutes when a controversy over interpretation arises. Courts must sometimes walk the walls separating the powers of the three branches, but courts must be aware that their duties and responsibilities are limited to the interpretation of a statute, and we cannot rewrite a statute to suit our own policy preferences. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). As we recently reiterated in *ArrowPointe Federal Credit Union v. Bailey*,

> Determinations of public policy "are chiefly within the province of the legislature, whose authority on these matters we must respect." *Fullbright v. Spinnaker Resorts, Inc.*, 420 S.C. 265, 271, 802 S.E.2d

794, 797 (2017). We do not sit as a superlegislature to second-guess the General Assembly's decisions. *Keyserling v. Beasley*, 322 S.C. 83, 86, 470 S.E.2d 100, 101 (1996); *see Smith v. Tiffany*, 419 S.C. 548, 565, 799 S.E.2d 479, 488 (2017) ("We are a court, not a legislative body."). "Respect for separation of powers compels us to recognize that the General Assembly is the author of our state's public policy . . . ." *State v. Slocumb*, 426 S.C. 297, 314, 827 S.E.2d 148, 157 (2019).

438 S.C. 573, 580, 884 S.E.2d 506, 509 (2023) (citation modified). The importance of restraint on our part cannot be overstated.

We agree with Respondents. We first reject the premise of Appellants' "rent" argument and hold that even if a portion of the $600 million gross settlement is, by some stretch, rent paid by the DOE for the continued storage of plutonium, the rent payment was part of a monetary settlement to which the Fee Agreement applies. In other words, the money Appellants claim is rent is no less real money than the part of the settlement paid to satisfy the DOE's economic and impact assistance obligations. We recognize all $600 million of the settlement funds as what they truly are—money paid by the DOE to the State in exchange for settlement of the State's claim for money damages, even in the face of the DOE's defense that Congress had not appropriated funds for such payment. And in addition, the United States is now obligated to remove 9.5 metric tons of defense plutonium from the Savannah River Site, and if it does not, it will owe the State additional money and still have to remove the plutonium.

Even if we were to accept the premise of Appellants' "rent" argument, we hold judicial determination of the reasonableness of the fee would violate the separation of powers provision in article I, section 8. We have fulfilled our constitutional duty to interpret subsection 1-7-150(B). South Carolina state courts have no inherent authority to determine the reasonableness of an attorney's fee, especially one arising from a settlement obtained after litigation in federal courts across the country. Absent authority granted by a constitutional statute or by the constitution itself, the judicial branch will not weigh in on the reasonableness of an attorney's fee under these circumstances.[4]

---

[4] On occasion, the General Assembly has given the judicial branch the authority to determine the reasonableness of an attorney's fee. For example, subsection 15-51-42(C) of the South Carolina Code provides that when a person brings a wrongful death or survival action and is represented by an attorney, upon settlement of the claim(s), the court must review the terms of the settlement, including

Finally, separation of powers considerations aside, subsection 1-7-150(B) neither explicitly requires nor remotely contemplates court approval of attorney's fees set forth in contingent fee agreements, and Appellants cite no other statutory provision for that proposition. As noted above, when construing subsection 1-7-150(B), we will reject a meaning that would lead to a result so plainly absurd that it could not have possibly been intended by the General Assembly. *Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994). It would indeed be absurd for this Court to (1) acknowledge the Attorney General's authority to enter into a binding fee agreement with the Law Firms—authority Appellants concede the Attorney General has; (2) hold subsection 1-7-150(B) does not require the attorney's fees in this case to be deposited into the general fund or the LRA; but (3) in the same breath give the judicial branch the authority to determine the reasonableness of the fee.

We find support for our exercise of judicial restraint in our decision in *Baddourah v. McMaster*, 433 S.C. 89, 856 S.E.2d 561 (2021). In *Baddourah*, we addressed the separation of powers doctrine as it related to the Governor's suspension of a city councilman who was indicted for second-degree domestic violence. Article VI, section 8 of the South Carolina Constitution gives the Governor the discretion to suspend a member of city council "who has been indicted by a grand jury for a crime involving moral turpitude," and the Governor determined second-degree domestic violence was such a crime. The indicted councilman argued this Court could review the Governor's decision to suspend him. We first held the Court could interpret the meaning of the term "moral turpitude," as the Court has the duty and authority to interpret the language of a provision in the constitution. *Id.* at 103, 856 S.E.2d at 568. After concluding second-degree domestic violence was a crime of moral

---

attorney's fees and costs, and approve the settlement only if "the settlement is fair and reasonable and in the best interests of the [wrongful death] beneficiaries and, in a survival action, the estate of the decedent . . . ." S.C. Code Ann. § 15-51-42(C). This provision gives the court authority to determine the reasonableness of the fee. Similarly, subsection 62-5-433(B) of the South Carolina Code (Supp. 2025) provides that when a claim in favor of or against a minor or incapacitated individual is settled and the amount of the settlement exceeds $25,000, a verified petition must be presented to the circuit court (or the probate court in certain circumstances). The petition must include, among other things, an itemization of "attorney's fees[] and expenses." S.C. Code Ann. § 62-5-433(B)(1). The court considering approval of the settlement must determine whether the settlement as a whole, including attorney's fees and expenses, is "proper and in the best interests of the minor or incapacitated individual." S.C. Code Ann. § 62-5-433(B)(2).

turpitude, we held our review of the Governor's discretionary decision to suspend the indicted councilman ended there, as the exclusive grant of suspension authority to the executive branch precluded judicial review of the Governor's discretionary act. *Id.* at 114, 856 S.E.2d at 574. Likewise, in the case before us, we have exercised our authority and duty to construe subsection 1-7-150(B), but we will not go further, as that would write a provision into the statute that does not exist.

**B.**

Even if we were to agree with Appellants that the courts have a valid role in determining the reasonableness of the fee, we note the fee in this case was properly calculated according to the scales in the Fee Agreement.[5] Also, as far as the overall services rendered by the Law Firms are concerned, the State, with the assistance of the Law Firms, secured the $600 million settlement; in addition, the State, through the Law Firms, secured an order from the federal district court requiring the DOE to remove one metric ton of plutonium from the Savannah River Site by December 31, 2019. Also, the Law Firms, on behalf of the State, intervened in the Nevada litigation and obtained concessions favorable to the State concerning the storage of the plutonium in Nevada.

As the nonmonetary litigation progressed to successful ends, the State, through W&H, initially sued the DOE for $100 million in economic and impact assistance payments the State alleged it was owed for 2016 under 50 U.S.C. § 2566. In March 2018, the State amended its complaint to seek an additional $100 million in economic and impact assistance payments it alleged it was owed for 2017. That amendment was hardly surprising, as the DOE's payment obligations increased by $100 million each year. In late August 2020, the State and the United States settled the case for $600 million. By that time, the State's claim for economic and impact assistance payments had grown by at least an additional $200 million ($100 million for 2018 and $100 million for 2019, and perhaps an additional $100 million for 2020). Lingering ominously over the State's suit against the DOE for money damages was Congress's 2005 amendment to 50 U.S.C. § 2566 providing that the DOE's liability for economic and impact assistance payments to South Carolina under § 2566 was "subject to the availability of appropriations" by Congress—and

---

[5] According to the four scales in the Fee Agreement, the fees total $76.25 million. For reasons they do not explain, the Law Firms have rounded that sum down to $75 million, or 12.5 percent of the gross recovery.

Congress ultimately made no such appropriations.  Even so, the $600 million settlement was secured.[6]

The Settlement Agreement does not break down the $600 million payment, but it provides the "agreement will resolve all claims relating to economic and [impact] assistance payments or removal of plutonium that have arisen, or will arise, between 2016 and the date on which the [DOE] completes removal of" the plutonium.  In exchange for the $600 million payment, the State agreed to "forego any legal action to enforce any rights, or to seek any relief whatsoever" arising from the DOE's obligations under 50 U.S.C. § 2566 concerning the conversion of the plutonium into MOX fuel.  This removed the specter of the lack of congressional appropriation of funds for payment under § 2566.  The Settlement Agreement also includes a formula for additional payments to be made by the United States if the plutonium has not been removed from the Savannah River Site by January 1, 2037.  At the time the Settlement Agreement was executed, 9.5 metric tons of defense plutonium or defense plutonium materials remained at the Savannah River Site.  According to the formula, the percentage of the 9.5 metric tons remaining as of January 1, 2037 is to be multiplied by $1.5 billion dollars, with the resulting sum to be paid to South Carolina by the United States of America.

The services provided by the Law Firms involved coordinated litigation against the federal government in four cases in three separate federal trial courts across the country, three separate federal appellate courts across the country, and the U.S. Supreme Court.  Countless hours were undoubtedly and necessarily expended by the Law Firms in setting strategy, reviewing documents, and coordinating and communicating with witnesses, political leaders, and various courts.  Also, the Law Firms undertook a substantial risk in entering into the Fee Agreement.  Three cases involved requests for injunctive relief and did not involve money damages.  If the Law Firms had been successful in the cases involving injunctive relief but failed to recover any money in connection with the COFC case, the Law Firms would have been entitled to no fees under the Fee Agreement.  The State's success in the litigation involving injunctive relief played a large part in securing the $600 million dollar settlement, the current contractual obligation of the United States to remove

_____

[6] Appellants contend the settlement was obtained with the assistance of politicians representing the State of South Carolina in the U.S. Senate and U.S. House of Representatives.  Even if we were to hold South Carolina courts have a role in determining the reasonableness of the fee, the involvement of politicians in the litigation would not be a factor.

9.5 metric tons of defense plutonium by 2037, and the contractual obligation of the United States to pay additional funds to the State if it fails to do so.

## V.

We affirm the circuit court's ruling that the Attorney General has the authority to enter into contingent fee agreements with private law firms. Indeed, Appellants do not dispute that ruling. We reject Appellants' request for a remand to determine the reasonableness of the fee. We hold the $75 million fee is payable to the Law Firms without first having to be deposited into the State's general fund or the LRA.

**AFFIRMED IN RESULT.**

**KITTREDGE, C.J., FEW, HILL and VERDIN, JJ., concur.**