**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1148

STATE OF SOUTH CAROLINA,

Plaintiff – Appellee,

v.

UNITED STATES OF AMERICA; RICK PERRY, in his official capacity as Secretary of the United States Department of Energy; NATIONAL NUCLEAR SECURITY ADMINISTRATION; LISA E. GORDON-HAGERTY, in her official capacity as Under Secretary for Nuclear Security and NNSA Administrator; UNITED STATES DEPARTMENT OF ENERGY,

Defendants – Appellants.

Appeal from the United States District Court for the District of South Carolina, at Aiken. J. Michelle Childs, District Judge. (1:16-cv-00391-JMC)

Argued: September 27, 2018                    Decided: October 26, 2018

Before NIEMEYER, KING, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Wynn joined.

**ARGUED:** Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Kenneth Paul Woodington, DAVIDSON, WREN & PLYLER, PA, Columbia, South Carolina, for Appellee. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Beth Drake, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for

Appellants. Alan Wilson, Robert D. Cook, T. Parkin Hunter, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina; Randolph R. Lowell, Benjamin P. Mustian, John W. Roberts, WILLOUGHBY & HOEFER, P.A., Columbia, South Carolina, for Appellee.

_____

KING, Circuit Judge:

The United States of America, the Department of Energy, the National Nuclear Security Administration, and two federal officials in their official capacities (collectively, the "DOE"), appeal from adverse rulings concerning the DOE's failure to comply with federal statutory obligations to remove not less than one metric ton of defense plutonium from South Carolina by January 1, 2016.[1]  After South Carolina sued in that regard, the district court for the District of South Carolina invoked an enforcement provision of the Administrative Procedure Act (the "APA") and awarded summary judgment to the State. *See South Carolina v. United States*, No. 1:16-cv-00391, slip op. (D.S.C. Mar. 20, 2017), ECF No. 86 (the "Opinion").[2]  The court then entered an injunction that required DOE to remove not less than one metric ton of defense plutonium from the State within two years.  *See id*., ECF No. 109 (the "Injunction").  On appeal, the DOE maintains that the court erroneously failed to exercise its equitable discretion before deciding to award the Injunction, and that the court also abused its discretion with regard to certain provisions thereof.  As explained below, we are satisfied that the court properly enforced the

---

[1] In referring to the five defendants collectively as the DOE, we adhere to the practice of the parties in their appellate submissions and recognize that the Department of Energy constitutes the key entity in this dispute.  We acknowledge that in some instances this collective term stands in for subdivisions of the Department, such as the National Nuclear Security Administration (the "NNSA"), or specific officials therein.  Finally, pursuant to Federal Rule of Appellate Procedure 43(c)(2), we have substituted defendant Lisa E. Gordon-Hagerty, Under Secretary for Nuclear Security and NNSA Administrator, who has succeeded to those capacities in the place and stead of her predecessor.

[2] The district court's Opinion of March 20, 2017 is published at 243 F. Supp. 3d 673 (D.S.C. 2017).

3

statutory responsibilities imposed on the DOE by Congress and that it also appropriately

crafted and entered the Injunction. We therefore affirm.


I.

A.

In the year 2000, the United States and Russia entered into the Plutonium

Management and Disposition Agreement, requiring each country to dispose of at least

thirty-four metric tons of weapons-grade plutonium. *See Agreement Between the*

*Government of the United States of America and the Government of the Russian*

*Federation Concerning the Management and Disposition of Plutonium No Longer*

*Required for Defense Purposes and Related Cooperation*, Russ.-U.S., Aug. 29 & Sept. 1,

2000 (entered into force July 13, 2011); *see also* J.A. 219.[3] To fulfill those obligations

on the part of our country, DOE devised a plan to convert thirty-four metric tons of

defense plutonium into mixed-oxide fuel ("MOX fuel") suitable for use in commercial

nuclear power reactors.[4] *See* Bob Stump National Defense Authorization Act for Fiscal

Year 2003, Pub. L. No. 107-314, div. C, § 3181, 116 Stat. 2458, 2747 (2002) ("NDAA

FY 2003") (codified in part at 50 U.S.C. § 2566). In 2002, Congress first appropriated

---

[3] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[4] As defined by statute and as used herein, the term "defense plutonium" refers to "weapons-usable plutonium." *See* 50 U.S.C. § 2566(h)(3). That term also encompasses the interchangeable phrase "defense plutonium materials." *See id*.; *see also* Injunction 2 n.2.

4

funds and enacted directives for the construction of a MOX fuel fabrication facility (the "MOX facility") to implement DOE's proposal. *See id.* Pursuant to DOE's plan, the MOX facility was to be constructed near Aiken, South Carolina (the "Savannah River Site," or "SRS"). *Id.*

DOE's decision to dispose of defense plutonium through the MOX facility in South Carolina was prompted in part by DOE's abandonment of an alternate technique for plutonium disposition called the "immobilization" process. *See* J.A. 106, 268. Additionally, DOE had committed to closing a nuclear facility in Colorado by 2006 and needed to locate a new site at which to store or dispose of the Colorado plutonium. DOE indicated in 2002 that transferring six metric tons of plutonium from Colorado to the SRS would also result in significant cost savings.

Although construction of the MOX facility at the SRS might help solve several of DOE's problems, then-Governor of South Carolina Jim Hodges expressed reservations about the project. He was concerned by DOE's increased reliance on the SRS and the potential adverse impact of transferring additional nuclear material into the State. In 2001 — before appropriating funds to build the MOX facility — Congress had directed the Secretary of Energy to consult with the Governor of South Carolina "regarding any decisions or plans" related to the disposition of defense plutonium at the SRS. *See* National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, § 3155, 115 Stat. 1012, 1378 (2001) ("NDAA FY 2002"). In 2001 and 2002, DOE communicated with Governor Hodges and other South Carolina officials regarding DOE's planned activities at the SRS. At various times, the Governor conveyed his fear

that DOE's insufficient financial and organizational commitment to defense plutonium disposition risked making South Carolina a "permanent repository" for weapons-grade plutonium. *See, e.g.*, J.A. 502.

In April 2002, Governor Hodges wrote to the Secretary of Energy, acknowledging the progress they had made in reaching agreement on the construction and operation of the MOX facility at the SRS. The Governor emphasized, however: "I must insist upon an ironclad agreement that is fully enforceable in a court of law. The stakes are too high to accept mere political assurances." *See* J.A. 515. Governor Hodges reminded the Secretary that DOE had promised to "set forth in a legally enforceable document" specific schedules for the MOX program and DOE's obligation to "retake possession of the plutonium if the Federal Government failed to live up to its commitment." *Id.*

In response to Governor Hodges, the Secretary of Energy proposed a written agreement delineating DOE's commitments to South Carolina with respect to the MOX facility. That proposal was intended to ensure that South Carolina would not be left holding and storing unprocessed plutonium should difficulties arise with the MOX facility. *See* J.A. 522-23, 525-30. Pursuant to the Secretary's proposal, if DOE failed to meet certain production objectives or other milestones concerning the MOX facility, DOE would begin removing defense plutonium from South Carolina. Among other provisions, the Secretary's proposal provided that, if DOE processed "less than one metric ton of plutonium through the MOX facility" in an eighteen-month period, DOE would remove at least one metric ton of defense plutonium from the SRS "within two years," and "all [plutonium] material" within "no more than eight years." *Id*. at 528. The

6

proposed agreement committed both parties to support federal legislation codifying those terms.[5]

Shortly thereafter, in December 2002, Congress passed the National Defense Authorization Act (the "NDAA") for Fiscal Year 2003 that first funded the MOX facility at the SRS. The NDAA contained, nearly verbatim, language from the Secretary's proposed agreement that required DOE to remove not less than one metric ton of defense plutonium within two years of a missed MOX production deadline. *Compare* NDAA FY 2003, § 3182(c), *with* J.A. 528. Specifically, the NDAA for fiscal year 2003 provided that:

> If the MOX production objective [to produce an average rate of 1 metric ton of MOX fuel per year] is not achieved as of January 1, 2009, the Secretary shall, consistent with the National Environmental Policy Act of 1969 and other applicable laws, remove from the State of South Carolina, for storage or disposal elsewhere —
>
> > (1) not later than January 1, 2011, not less than 1 metric ton of defense plutonium or defense plutonium materials; and
> >
> > (2) not later than January 1, 2017, an amount of defense plutonium or defense plutonium materials equal to the amount [transferred to the SRS after April 15, 2002, that remains unprocessed].

*See* NDAA FY 2003, § 3182(c), (g).

In enacting the fiscal year 2003 NDAA, Congress made several findings that are pertinent here. It acknowledged the shared interest of South Carolina and the United

---

[5] The record on appeal contains the Secretary of Energy's proposed agreement with South Carolina, dated April 11, 2002, that bears the Secretary's signature only. *See* J.A. 531. The record does not reveal whether Governor Hodges also signed that agreement.

States in "the safe, proper, and efficient operation of the plutonium disposition facilities" at the SRS. Congress also recognized South Carolina's desire "to ensure that all plutonium transferred to the State" be stored safely, and that all weapons-grade plutonium transferred to the SRS "either be processed or be removed expeditiously." *See* NDAA FY 2003, § 3181.

The portion of the fiscal year 2003 NDAA mandating removal of defense plutonium from South Carolina was subsequently codified at 50 U.S.C. § 2566(c). Those provisions have been amended on several occasions to extend the initial deadlines. In its current and relevant form, § 2566(c) provides:

> If the MOX production objective [to produce an average rate of 1 metric ton of MOX fuel per year] is not achieved as of January 1, 2014, the Secretary shall, consistent with the National Environmental Policy Act of 1969 and other applicable laws, remove from the State of South Carolina, for storage or disposal elsewhere —
>
> > (1) not later than January 1, 2016, not less than 1 metric ton of defense plutonium or defense plutonium materials; and
> >
> > (2) not later than January 1, 2022, an amount of defense plutonium or defense plutonium materials equal to the amount [transferred to the SRS after April 15, 2002, that remains unprocessed].

*See* 50 U.S.C. § 2566(c); *see also id.* § 2566(h)(1) (defining MOX fuel production objective). As an additional remedy, § 2566(d) requires that DOE pay South Carolina $1,000,000 per day up to $100,000,000 until the production objective is achieved or until the Secretary removes not less than one metric ton of defense plutonium from South Carolina. Those payments represent "economic and impact assistance" to the State, and remain contingent upon "the availability of appropriations." *See id*. § 2566(d).

8

In 2012, DOE began using the SRS not only to convert plutonium into MOX fuel, as theretofore planned, but also to dispose of defense plutonium through a new and different process called "downblending." *See* J.A. 847. Downblending involves mixing plutonium with other materials to ensure that defense plutonium is not "readily recoverable." *See id*. n.6. As the district court defined it: "'Downblending' is a process in which defense ('weapons usable') plutonium is transformed into non-defense (not 'weapons usable') plutonium." *See* Injunction 4 n.3.[6]

The downblending process requires a "glovebox," which is a specialized protective installation in which the downblending occurs. *See* J.A. 843 n.1, 849, 852. As of August 2017, the MOX facility at the SRS contained a single glovebox; but additional gloveboxes could become operational by 2026 if DOE receives adequate funding. With a single operational glovebox, it takes approximately two days to downblend about 4.4 kilograms of plutonium.[7]

As DOE explored and developed the downblending process, its work on the MOX facility at the SRS experienced continual delays and unforeseen cost increases. Consequently, DOE reduced its funding request in 2013 for the MOX facility in its annual budget proposal. DOE reported to Congress that it planned to "slow down the

[6] Downblending is also referred to by DOE as "dilution" or the "WIPP disposal option." *See* J.A. 847. The acronym "WIPP," as used by DOE, refers to the Waste Isolation Pilot Plant near Carlsbad, New Mexico, where DOE has stored some downblended defense plutonium. *See* J.A. 846-48.

[7] In 2012, DOE stopped downblending defense plutonium at the SRS due to unrelated funding and technical issues. DOE resumed downblending at the SRS in 2016.

MOX project" while it assessed "alternative plutonium disposition strategies." *See* J.A. 547. By 2014, DOE had concluded that the MOX fuel conversion process was "not viable within available resources." *Id.* at 426. DOE's 2014 congressional budget request therefore conveyed its intention to place the MOX facility in "cold stand-by," operating at minimal levels while DOE reviewed its options. *Id.* DOE simultaneously acknowledged that it would not meet the MOX production objective established by § 2566(c), that is, producing MOX fuel at a rate of one metric ton per year by January 1, 2014. Accordingly, DOE suspended transfers of additional defense plutonium to the SRS and promised to submit a report to Congress setting out options for removing an amount of defense plutonium from South Carolina that would be equivalent to the amount transferred into the State since April 15, 2002, as required by § 2566(b).

Faced with DOE's apparent abandonment of the MOX project at the SRS, South Carolina filed suit against DOE in the District of South Carolina in March 2014. *See South Carolina v. U.S. Dep't of Energy*, No. 1:14-cv-00975 (D.S.C. 2014). The parties soon entered into a stipulated dismissal of those proceedings, however, when DOE agreed to continue constructing the MOX facility. *See id.*, ECF No. 19. In its consolidated appropriations bill for fiscal year 2016, Congress's explanatory statement asserted that the funds allocated for the construction of the MOX facility "shall be available *only*" for that purpose. *See* J.A. 569, 583 (emphasis added).

Notwithstanding DOE's stated commitment to pursuing defense plutonium disposition at the SRS through the MOX project — and the continuing congressional support for that project — DOE continued to pursue its favored alternative of

10

downblending for such disposition. In February 2016, DOE's congressional budget request reported that the MOX project was "significantly more expensive than anticipated" and would need "approximately $800 million to $1 billion annually for decades." *See* J.A. 612. DOE therefore proposed terminating the MOX project at SRS in favor of downblending.

By the fall of 2015, it was clear that DOE would neither achieve its MOX production objective nor remove not less than one metric ton of defense plutonium from SRS by the statutory deadline of January 1, 2016. In September 2015, the State's Attorney General wrote the Secretary of Energy and sought a commitment that DOE would "abide by its legal duties." *See* J.A. 416-19. On December 14, 2015, then-Governor Nikki Haley wrote to the Secretary and notified him of "South Carolina's intent to enforce federal law" and collect the assistance payments provided for under § 2566(d) if DOE did not meet its statutory obligations. *See id*. at 651-52. The Secretary responded to the Governor with a letter that generally affirmed DOE's commitment to plutonium disposition but did not make any concrete assurances. *See id*. at 654. The parties do not dispute that the January 1, 2016 deadline passed without DOE achieving its MOX production objective at the SRS. And the DOE has not removed "not less than [one] metric ton of defense plutonium" from South Carolina, or made any of the statutory assistance payments to the State. *See* 50 U.S.C. § 2566(c), (d).

B.

In February 2016, South Carolina filed the complaint underlying this lawsuit in the District of South Carolina, seeking to compel DOE to comply with the terms of § 2566(c)

11

and § 2566(d).  *See South Carolina v. United States*, No. 1:16-cv-00391 (D.S.C. Feb. 9, 2016), ECF No. 1.  More specifically, South Carolina sought, inter alia, an injunctive order requiring DOE to promptly remove not less than one metric ton of defense plutonium from South Carolina and make $1 million per day assistance payments to the State, as required by statute.  The complaint also alleged a constitutional claim, asserting that DOE's failure to comply with § 2566 contravened the Take Care Clause of Article II of the Constitution.  The State sought relief for these claims under the APA and by way of a writ of mandamus (under the All Writs Act).  Soon thereafter, in April 2016, the parties cross-filed dispositive motions: DOE sought dismissal of South Carolina's claims and the State requested summary judgment against DOE.

In February 2017, the district court dismissed South Carolina's claim for payments under § 2566(d)(1), without prejudice to the State pursuing those payments in the Court of Federal Claims.  About a month later, on March 14, 2017, the court addressed the dismissal issues concerning the balance of South Carolina's claims.  *See South Carolina*, No. 1:16-cv-00391 (D.S.C. Mar. 14, 2017), ECF No. 84 (the "Dismissal Order").  The Dismissal Order rejected South Carolina's constitutional claim but declined to dismiss the State's claim for removal of not less than one metric ton of defense plutonium.  The court reasoned that § 2566(c) imposed a nondiscretionary duty on DOE to remove a metric ton of defense plutonium from South Carolina by January 1, 2016.  The Dismissal Order thus rejected DOE's contention that the statute merely created unenforceable goals.

Only a week later, on March 20, 2017, the district court granted South Carolina's motion for summary judgment on its claim for enforcement of § 2566(c)'s removal

provision. The court's Opinion determined that the relief sought by South Carolina was available under § 706(1) of the APA because the State sought only to compel "unlawfully withheld" agency action, within the meaning of that provision. *See* Opinion 29-30. As a result, the court denied the State's alternative request under the All Writs Act for mandamus relief.

Because the State was entitled to relief under § 706(1) of the APA, the Opinion then assessed the requirements for relief under that statutory provision, as well as the nature of the relief it might award. *See* Opinion 30. In its earlier Dismissal Order, the district court had concluded that § 2566(c) imposed a nondiscretionary duty on the Secretary of Energy to remove not less than one metric ton of defense plutonium from South Carolina by January 1, 2016, if DOE failed to meet its MOX production objective by January 1, 2014. *See id.*; *see also* Dismissal Order 18-45. The specific agency action South Carolina sought to compel — timely removal of defense plutonium from the State — thus satisfied the standard for contestable agency actions or omissions under the APA. In the summary judgment proceedings, it was undisputed that DOE had failed to meet its production objective, as established by § 2566(c) and § 2566(h), and that it had failed to remove not less than one metric ton of defense plutonium from South Carolina by the statutory deadline. Accordingly, the Opinion ruled that South Carolina was entitled to judgment as a matter of law and to an order of the court "compelling the Secretary to take the unlawfully withheld agency action." *See* Opinion 31.

In so ruling, the Opinion conducted a searching analysis of the text and history of § 706(1) of Title 5, reviewing the relationship of that statutory provision to the equitable

13

writ of mandamus and the relevant precedents applicable to those types of proceedings. *See* Opinion 9-29, 31. After making that analysis, the Opinion concluded that, by way of § 706(1), the APA requires a court to compel the agency action that has been unlawfully withheld. In that circumstance, the court could not entertain the equitable considerations that would apply if the relief had been awarded by way of mandamus.

Although the Opinion recognized that in some respects § 706(1) "carried forward" the traditional practices and procedures relating to mandamus proceedings, *id.* at 10, it determined that the plain terms of § 706(1) clearly evinced a congressional intent to restrict the equitable powers of a court faced with unlawfully withheld agency actions, *see id.* at 29. In so ruling, the district court relied primarily on the text of § 706(1), which provides: "The reviewing court shall— (1) compel agency action unlawfully withheld or unreasonably delayed . . . ." *See* 5 U.S.C. § 706(1). Determining that the word "shall" refers to a mandatory act, the court also assessed the provision's legislative history, a Tenth Circuit decision titled *Forest Guardians v. Babbitt*, and a broad array of other authorities bearing on § 706 and awards of injunctive relief under the APA. *See* Opinion 13-29. In the final analysis, the Opinion concluded that § 706 required the court to compel DOE to fulfill its statutory obligations, without according deference to any asserted equitable considerations.

The district court did not, however, award the specific relief sought by South Carolina. Although § 706(1) required the court to compel DOE's compliance with § 2566(c), the Opinion declined to order an "immediate" removal of defense plutonium from SRS, as requested by the State. *See* Opinion 32. The undisputed facts showed that

14

DOE could not immediately remove plutonium from South Carolina in a manner that would comply with the requirements of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* And § 2566(c) itself mandated that DOE comply with NEPA. The Opinion correctly observed that the court was not entitled to order DOE to violate federal law. Rather, in devising its relief order the court was obliged to "consider the work that is necessary to accomplish the removal consistently with NEPA and other applicable laws." *See* Opinion at 33. As a result, the court requested supplemental submissions from the parties to assist the fashioning of an appropriate injunction. Finally, the Opinion denied South Carolina's request for declaratory relief, specifying that such relief was unnecessary in light of the injunctive relief that would be awarded.

Although the district court requested that the parties prepare a "joint written statement" to aid its preparation of an injunctive order, the parties could not agree and therefore made separate submissions. South Carolina proposed an injunction that, inter alia, would require DOE to remove not less than one metric ton of defense plutonium from South Carolina within two years; initiate a NEPA review of such removal within sixty days; and provide the court with regular progress reports. South Carolina also requested that the court retain jurisdiction until DOE fully complied with the injunction.

In its separate submission, DOE reiterated its preference for downblending and explained that, if it pursued downblending, it could not remove a metric ton of plutonium from South Carolina within two years. Relying on the declaration of a DOE Plutonium Program Manager at the SRS (the "Gunter Declaration"), DOE estimated that it could

15

first remove a ton of plutonium through downblending "by the end of [fiscal year] 2025." *See South Carolina*, No. 1:16-cv-00391, ECF No. 100 at 9. DOE thus asked the district court to exercise its discretion in fashioning an injunction, and requested that the court merely enjoin DOE to use its "best efforts to expeditiously comply with the timeline set forth" in the Gunter Declaration. *Id*. at 14.

DOE also defended its preference for downblending, arguing that there was "no guarantee whatsoever" that pursuing the MOX project would result in a more expeditious removal of plutonium from South Carolina than by using downblending. *Id*. at 14-22. Relying on the Gunter Declaration, DOE maintained that downblending provided a safer and less challenging means of plutonium disposition than continuing to pursue the MOX fuel conversion process. Finally, DOE asserted that — using any removal method — South Carolina's proposed two-year deadline was impossible to achieve. DOE emphasized that South Carolina had conceded that flexibility was needed in setting the removal deadline and the DOE faulted the State for failing to demonstrate that its proposed two-year timeline was feasible.

In reply, South Carolina stressed that DOE's objection to a two-year deadline simply presumed that NEPA required DOE to conduct a new Environmental Impact Statement ("EIS") before embarking on removal. As the State explained, NEPA also allows a federal agency, in the proper circumstances, to make an abbreviated environmental analysis. The State contended that DOE had failed to support its assertion that removal required a full EIS rather than, for example, a more concise Environmental Assessment. The State also argued that a statutory mandate will always supersede an

16

agency's preference, and concluded by describing the various plutonium transfers DOE had accomplished in recent years.

After assessing those submissions, the district court entered its Injunction on December 20, 2017. The court therein chastised DOE for attempting to rehash its previously litigated arguments and for its "non-responsive" submission. Having received minimal assistance from DOE to evaluate viable removal methods, the court predicated its Injunction on the available record and the terms of § 2566. The Injunction observed that Congress had, from the beginning, consistently fixed a two-year deadline for removing not less than a ton of defense plutonium from South Carolina following DOE's failure to meet the MOX production objective, and the court concluded that the statutory deadline should inform its decision. The Injunction also instructed DOE that the proper time to raise its impossibility defense was after it had diligently sought to comply with the court's deadline.

The Injunction rejected DOE's request for an open-ended timeline or a 2025 deadline. As the Injunction explained, beyond the fact that those proposals ignored the two-year timeframe set out in § 2566(c), any such open-ended provision would ignore and contravene § 2566(c)(2), which required the removal of all defense plutonium transferred to the SRS after April 15, 2002, by no later than January 1, 2022. Because DOE's proposed deadline of 2025 was based on its planned use of downblending, the Injunction specified that DOE could use downblending "*only if* it assists in removing the defense plutonium from South Carolina in the most expeditious way possible," while

17

complying with the initial removal requirements of § 2566(c)(1) — removing not less than one metric ton of plutonium from the State within two years. *See* Injunction 5.

The Injunction, however, did not adopt South Carolina's proposal in its entirety. The Injunction declined to order DOE to reprogram or request funds for removal, recognizing that a court could not dictate how an agency may accomplish its statutorily mandated tasks. The court also declined to impose monetary sanctions on the DOE in advance of a failure to comply with the Injunction. Thus, the Injunction of December 20, 2017, provides, inter alia, as follows:

- The Secretary of Energy must, consistent with NEPA and other laws, remove not less than one metric ton of defense plutonium from South Carolina within two years of the Injunction, or at the latest by January 1, 2020;

- The district court retains jurisdiction to enforce the Injunction;

- DOE must provide the court and South Carolina with copies of all of DOE's reports to Congress regarding the removal of defense plutonium from South Carolina;

- DOE must submit progress reports to the court and South Carolina every 180 days; and

- The Secretary of Energy must submit a sworn attestation alerting the court and South Carolina once DOE accomplishes the required removal of plutonium from the State.

*See* Injunction 10-11.

DOE has timely appealed the judgment of the district court. The DOE maintains that we possess final decision jurisdiction pursuant to 28 U.S.C. § 1291. South Carolina, however, has not espoused a position on our jurisdiction. Generally, we possess appellate jurisdiction to review an injunction order, even when a district court has retained

18

jurisdiction to enforce the order. *See Hudson v. Pittsylvania County*, 774 F.3d 231, 234 (4th Cir. 2014) (confirming that district court's continuing jurisdiction to enforce injunction "does not render that order non-final" under § 1291). That said, this Injunction imposed various continuing obligations on the DOE, such as providing regular progress reports to the court and the State. Nevertheless, we are satisfied that we possess jurisdiction pursuant to § 1292(a)(1), which "provides this Court with jurisdiction over district court decisions 'granting, continuing, modifying, refusing or dissolving injunctions.'" *Everett v. Pitt Cty. Bd. of Educ.*, 678 F.3d 281, 288 (4th Cir. 2012) (quoting § 1292(a)(1)). Because we are confident of our § 1292 jurisdiction, we need not resolve whether we also have jurisdiction under § 1291.

II.

This Court reviews "an order granting an injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions *de novo*." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 125 (4th Cir. 2011). The scope of injunctive relief likewise rests within the "sound discretion" of the district court. *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002). A district court abuses its discretion if its injunctive order "is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *PBM Prods., LLC*, 639 F.3d at 125. A district court also abuses its discretion if it "otherwise acts arbitrarily or irrationally in its ruling." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017) (internal quotation marks omitted).

19

III.

On appeal, the DOE presents two challenges to the district court's rulings. First, the DOE maintains that the court erred as a matter of law when it concluded that, because the DOE had unlawfully withheld a legally-required agency action, the court lacked any discretion to deny relief to South Carolina. More specifically, DOE contends that the principles governing mandamus proceedings, as well as fundamental principles of injunctive relief, control the award of an injunction under the APA. DOE argues that those principles required the court — even after identifying an unlawfully withheld agency action — to exercise its equitable discretion and not award any injunctive relief to South Carolina. The State, on the other hand, contends that the district court correctly applied the plain terms of the APA. Pursuant thereto, South Carolina argues, the court was obliged to compel DOE to take the statutorily-required action it had unlawfully withheld — namely, the removal of not less than a metric ton of defense plutonium from South Carolina.

By way of its second appellate contention, the DOE argues that the two-year deadline imposed by the Injunction for removing defense plutonium from South Carolina was an abuse of the district court's discretion.[8] More specifically, the DOE argues that the court lacked any sound legal or factual basis for entering the Injunction, and it maintains that compliance with the Injunction is simply impossible. In opposing this

_____

[8] In its appeal, DOE is not contesting either the reporting requirements of the Injunction or the district court's retention of jurisdiction to enforce the provisions thereof.

contention, South Carolina counters that the court carefully considered the applicable legal principles and relevant facts and thus did not abuse its broad discretion. We will address and resolve those issues in turn.

A.

The district court granted relief to South Carolina only after concluding in its Opinion that when an agency — such as the DOE — has unlawfully withheld a legally-required action, § 706(1) of the APA obliges a court to compel the agency's compliance. Thus, because the court concluded that the DOE had unlawfully withheld an agency action that was mandated by statute — removing not less than a metric ton of defense plutonium from South Carolina — the court also determined that it was obliged by law to appropriately enjoin the DOE.

The DOE disputes the district court's understanding of § 706(1) and argues that it legally erred. According to DOE, an award of injunctive relief under § 706(1) is subject to the fundamental principles governing mandamus proceedings, including the settled tenet that a court should properly exercise its equitable discretion before dispensing relief. DOE also asserts that general principles of injunctive relief required the court — even after it concluded that DOE had unlawfully withheld a legally-required action — to consider the relevant equities before granting any relief to the State.

This appeal presents a question we have not heretofore resolved: Does a district court possess discretion to grant or deny injunctive relief against unlawfully withheld agency action pursuant to § 706(1)? Given DOE's arguments that such an injunction mirrors an award of mandamus relief, we will assess the district court's determination

21

that the Injunction was properly issued under the APA rather than by way of mandamus, delineating several key distinctions between those two processes. We will then consider whether such a court retains the equitable discretion to determine whether to compel unlawfully withheld agency action.

1.

The common-law writ of mandamus, codified in the All Writs Act at 28 U.S.C. § 1651, has long been reserved for "extraordinary causes." *Cheney v. U.S. Court for D.C.*, 542 U.S. 367, 380 (2004). Accordingly, relief by way of mandamus is only available if a plaintiff has "no other adequate means to attain the relief" sought. *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 403 (1976); *see also In re Beard*, 811 F.2d 818, 826 (4th Cir. 1987). If a statute "specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985). Several courts have affirmed that principle when granting relief under the APA. *See Serrano v. U.S. Atty. Gen.*, 655 F.3d 1260, 1264 (11th Cir. 2011); *Sharkey v. Quarantillo*, 541 F.3d 75, 93 (2d Cir. 2008); *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997); *Stehney v. Perry*, 101 F.3d 925, 934 (3d Cir. 1996); *Seiden v. United States*, 537 F.2d 867, 870 (6th Cir. 1976); *see also In re City of Va. Beach*, 42 F.3d 881, 885 (4th Cir. 1994) (addressing interlocutory petition for agency action under mandamus but observing that final agency action would be reviewed under APA).

The availability of the mandamus writ is controlled by two additional factors. First, a plaintiff must demonstrate "a clear and indisputable right to the relief sought" and

22

show that "the responding party has a clear duty to do the specific act requested." *Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016); *see also Kerr*, 426 U.S. at 403. Second, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. In other words, a district court must exercise equitable discretion before granting mandamus relief. *See id.*; *United States ex rel. Rahman v. Oncology Assocs., PC*, 198 F.3d 502, 511 (4th Cir. 1999).

In its complaint in this litigation, South Carolina sought to enforce the plutonium removal provision of 50 U.S.C. § 2566 by way of both the APA and the All Writs Act. Applying the foregoing principles, the district court concluded that if the State merited relief under the APA, it could not simultaneously obtain mandamus relief. The court then determined that South Carolina was entitled to injunctive relief under the APA.

Section 706 of the APA provides that: "The reviewing court shall— (1) compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706(1). South Carolina's complaint implicated the first type of claim contained therein, that is, relief from "agency action unlawfully withheld" rather than action "unreasonably delayed." The Supreme Court addressed the APA's § 706 in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"). As explained in the *SUWA* decision, an "agency action," as that term is used in § 706(1), encompasses only "*discrete* action[s]" that are "legally *required*." 542 U.S. at 63.

Here, § 2566(c) required that DOE take a discrete action: if DOE failed to meet the MOX production objective, it was obligated to remove not less than one metric ton of

23

defense plutonium from South Carolina by January 1, 2016. The undisputed facts are that DOE failed to achieve the MOX production objective imposed by § 2566, triggering the removal requirement. DOE's failure to remove not less than a metric ton of defense plutonium from South Carolina by the statutory deadline thus constituted an unlawfully withheld agency action within the meaning of § 706(1). *See SUWA*, 542 U.S. at 65 (explaining that agency failure to meet mandatory deadline supports § 706(1) claim); *Forest Guardians*, 174 F.3d 1178, 1190 (10th Cir. 1999) (clarifying that "the distinction between agency action 'unlawfully withheld' and 'unreasonably delayed' turns on whether Congress imposed a date-certain deadline on agency action") (citing *Sierra Club v. Thomas*, 828 F.2d 783, 794-95 & nn. 77-80 (D.C. Cir. 1987)); *see also Calderon-Ramirez v. McCament*, 877 F.3d 272, 276 (7th Cir. 2017) (same). As a result, the Opinion correctly concluded that DOE's failure to comply with § 2566(c) entitled South Carolina to relief under § 706(1), which, in turn, precluded an award of mandamus relief.

The DOE does not contest the proposition that South Carolina can obtain the relief it seeks under the APA, or that such relief bars any related redress by way of mandamus. The DOE contends that the district court erred in concluding that § 706(1) prevented it from exercising its equitable discretion in deciding whether to award an injunction. DOE asserts that because such discretion informs the award of similar relief pursuant to mandamus relief, it also informs an award of relief under § 706(1). With the governing principles of mandamus and § 706(1) in mind, we will assess the appellate contention of the DOE.

24

2.

Well-established practice and controlling precedent both confirm that equitable discretion inheres in the issuance of a writ of mandamus. *See, e.g.*, *Rahman*, 198 F.3d at 511. By contrast, the Opinion concluded that the plain language of § 706(1) curtailed the court's discretion in deciding whether to grant relief under that provision. DOE contests that conclusion and asserts that relief under § 706(1) is subject to the traditional tenets governing mandamus writs, including a court's obligation to weigh the relevant equities before granting relief. *See* Br. of Appellants 11-12.

We are satisfied, however, that the DOE's preferred view of § 706(1) finds no legal basis in the APA or controlling precedent. Contrary to basic interpretive rules, DOE's position would have us apply general mandamus principles instead of the specific statutory text. Our consideration of the controlling authorities compels us to agree with the district court that, if a party has successfully demonstrated an unlawfully withheld agency action under § 706(1), the court must enter an appropriate order and secure the agency's compliance with the law. If the agency's legal obligation falls within the scope of § 706(1), such an order must issue regardless of equitable or policy considerations.

As explained below, we reach this conclusion only after carefully assessing de novo four legal issues presented in this regard. First, we examine the plain text of § 706(1) and apply ordinary rules of statutory interpretation to discern its meaning. Next, we consider whether any precedent supports DOE's contention that § 706(1) incorporates mandamus principles. We then distinguish South Carolina's challenge to an "unlawfully withheld" agency action from separate statutory claims against "unreasonably delayed"

25

agency actions. Finally, we will evaluate the impact of the general principles of equitable relief on the application of § 706(1).

a.

We begin our analysis by considering the statutory language of the APA at issue in this appeal. *See Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) (emphasizing that statutory analysis begins with the "specific statutory language in dispute"). The plain text of § 706 shows that a reviewing court lacks discretion when faced with unlawful agency inaction. Again, § 706(1) provides that: "The reviewing court *shall*— (1) compel agency action unlawfully withheld or unreasonably delayed . . . ." *See* 5 U.S.C. § 706(1) (emphasis added). And "the word 'shall' usually creates a mandate," indicating that "the district court has some nondiscretionary duty to perform." *Murphy*, 138 S. Ct. at 787 (citing *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion.")). Furthermore, Congress's use of the word "may" in adjacent portions of the APA reinforces the conclusion that it knowingly selected "the mandatory term 'shall'" in crafting § 706(1). *See In re Rowe*, 750 F.3d 392, 396-97 (4th Cir. 2014); *compare* 5 U.S.C. § 705, *with* § 706(1).

As the district court concluded, nothing in the APA's text or legislative history calls into question the ordinary meaning of the word "shall" as it is used in § 706(1). *See*

Opinion 13-29. And the DOE does not meaningfully contest that analysis on appeal.[9]

The DOE contends, however, that fundamental mandamus procedures — specifically, conditioning such relief upon equitable considerations — must be superimposed onto the text of § 706(1). We are constrained to disagree.

b.

We observe initially that there is no precedent that supports a rule that requires a district court to apply judicially-created mandamus rules to the text of the APA. Contrary to DOE's assertion in that regard, neither the Supreme Court's decision in *SUWA* nor any other precedent compels such a proposition.

In *SUWA*, the leading Supreme Court case concerning § 706(1), the Court held in 2004 that an "agency action" must be "legally *required*" to be subject to challenge under § 706. *See* 542 U.S. at 63. In so ruling, the Court buttressed its textual analysis by invoking the prerogative writs, such as mandamus, that had enabled judicial review of agency decisions prior to the APA. *See id*. The *SUWA* Court simply observed that mandamus relief "was normally limited to enforcement of a specific, unequivocal command." *Id*. Thus, insofar as the APA sought to enforce compliance only as to

_____

[9] The DOE suggests on appeal that another provision of the APA requires reading mandamus principles into § 706. Specifically, DOE views § 703 of the APA as proof that, because the APA did not create any new form of action, it necessarily preserved all the practices related to traditional legal remedies. *See* Br. of Appellants 15. Section 703, however, merely demonstrates that the APA does not preclude the use of preexisting types of legal actions, such as declaratory judgment proceedings, as appropriate in the proper situations. It says nothing about whether discretion is possessed by a court awarding relief under § 706.

27

"agency action *unlawfully* withheld," the APA, "*[i]n this regard . . .* carried forward the traditional practice prior to its passage." *Id*. (second emphasis added).

The DOE has seized upon that comment by the Court and argues today that § 706 broadly "carried forward" the rules and practices governing mandamus relief. *See* Br. of Appellants 14-15. Tellingly, DOE's explanation omits the phrase "in this regard" from its quotation of the *SUWA* decision. In examining *SUWA*'s analysis in context, we are satisfied that the Court in no way intended to subject statutory claims under the APA to the full panoply of common-law rules governing mandamus proceedings. Rather, the Court merely referenced past practice to confirm its textually-derived understanding of the term "agency action," as the term was used in the APA.

More specifically, the reference in § 706 to an "*unlawfully* withheld" agency action demonstrated to the Court that only a "legally *required*" agency action could be challenged under that provision. *See SUWA*, 542 U.S. at 63. The APA thus aligned with an aspect of mandamus proceedings as they existed prior to the APA and as they exist today under the All Writs Act: both authorize enforcement of only specific, nondiscretionary agency obligations, and neither reaches decisions committed to the agency's discretion. *See id*. at 63-64; *Cumberland*, 816 F.3d at 52. That this limitation applies to relief under both the APA and the All Writs Act is unsurprising. In both situations, the limitation of judicial review to legally-required agency actions serves "to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 63, 66.

28

The *SUWA* decision emphasized the foregoing principle (that only discrete, mandatory agency actions are contestable in the courts) and invoked it to support the Court's textual analysis of "agency action," as used in the APA. The Court simply recognized that, in this regard, the APA did not depart from the practice in use prior to the APA or from present practice under the All Writs Act. *See id.* at 63-64. The Court did not, however, expand that narrow observation to any other aspects of § 706 relief or seek to displace the meaning of the statutory text.

In sum, the *SUWA* decision does not mandate an exercise of equitable discretion before a district court grants relief against an "agency action unlawfully withheld" under § 706(1).[10] *SUWA* therefore does not undermine the plain meaning of § 706(1), which unequivocally mandates that courts "shall" compel unlawfully withheld agency action. *See* 5 U.S.C. § 706(1); *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (emphasizing that lodestar of statutory interpretation remains "ordinary, contemporary, common meaning" of text).

Our conclusion in this regard fully comports with the rulings of our sister circuits. Only two other courts of appeals have directly considered whether § 706(1) requires a

---

[10] The DOE also contends on appeal that the Attorney General's Manual on the APA demonstrates that mandamus principles were incorporated into the APA. *See* Br. of Appellants 15. This argument, too, is unavailing. The Manual simply provides an account of prior practice and offers no opinion on the scope of a court's discretion when an agency unlawfully withholds a mandated action. *See* Attorney General's Manual on the Administrative Procedure Act 108 (1947), § 10(e) – Scope of Review. Indeed, the Manual reviews the same principles that the Court recited in *SUWA*, and does not call into question the ordinary meaning of § 706(1).

court to award injunctive relief in the face of unlawfully withheld agency action: the Ninth Circuit in *Vietnam Veterans of America v. Central Intelligence Agency*, 811 F.3d 1068 (9th Cir. 2015), and the 1999 Tenth Circuit decision *Forest Guardians*, 174 F.3d 1178. Relying primarily on the plain text of § 706(1), those courts concluded that the statute mandates the award of injunctive relief when a plaintiff succeeds in challenging unlawfully withheld agency action. In other words, when a court determines that an agency has wrongfully withheld a legally-required action — as defined by the APA and *SUWA* — the court must award injunctive relief to secure the agency's compliance. *See Viet. Veterans of Am.*, 811 F.3d at 1081 ("The word 'shall' requires a court to compel agency action when, as here, there is a 'specific, unequivocal command' that the agency must act.") (quoting § 706(1); *SUWA*, 542 U.S. at 63-64)); *Forest Guardians*, 174 F.3d at 1187 (concluding that "[t]hrough § 706 Congress has stated unequivocally that courts must compel agency action unlawfully withheld"). We agree with our sister circuits, which have applied the text of § 706(1) and ordinary principles of statutory interpretation. As the Tenth Circuit aptly put it:

> [W]hen Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion. The agency must act by the deadline. If it withholds such timely action, a reviewing court must compel the action unlawfully withheld. To hold otherwise would be an affront to our tradition of legislative supremacy and constitutionally separated powers.

*Forest Guardians*, 174 F.3d at 1190.

According deference to the applicable congressional command compels the same conclusion. In § 706(1), as in most circumstances, "shall" means "shall." *See Murphy*,

30

138 S. Ct. at 787; *In re Rowe*, 750 F.3d at 396-97. The APA neither incorporates nor alludes to the mandamus writ, nor does it admit to any ambiguity. Consequently, a district court is not entitled to interpose its equitable judgment in granting relief pursuant to § 706(1). Thus, in response to DOE's plea for an application of equitable discretion, "the short answer is that Congress did not write the statute that way." *United States v. Monsanto*, 491 U.S. 600, 611 (1989).

c.

We now distinguish South Carolina's challenge to an "unlawfully withheld" agency action from separate statutory claims against "unreasonably delayed" agency actions. Because of the close connection between the relief the APA provides in both of those circumstances, it behooves us to recognize the distinction between the two claims. As explained below, a court can and should weigh equitable factors in assessing whether to grant relief for unreasonably delayed agency actions but may not do so in awarding relief for actions unlawfully withheld.

The DOE correctly points out that district courts addressing claims for unreasonably delayed agency action have often employed equitable factors in deciding whether to grant injunctive relief. *See* Reply Br. of Appellants 3. Because "unreasonable delay" claims derive from the very statutory provision — § 706(1) — that authorizes South Carolina's claim for relief, the DOE argues in support of a uniform standard applicable to both aspects of § 706(1). *See id.*; *see also* 5 U.S.C. § 706(1) (providing that courts shall "compel agency action unlawfully withheld or unreasonably delayed"). But

31

a claim challenging an "unreasonably delayed" agency action is sufficiently distinct from a claim contesting "unlawfully withheld" agency action to differentiate those provisions.

The D.C. Circuit's 2001 decision in *Cobell v. Norton* illustrates the validity of that distinction. *See* 240 F.3d 1081 (D.C. Cir. 2001). In *Cobell*, the federal government had failed to timely comply with its fiduciary obligations to Native American beneficiaries of certain trust accounts. *See* 240 F.3d at 1086, 1095-96. The applicable statute contained "no deadlines," and the court analyzed the agency's inaction as being "unreasonably delayed" rather than "unlawfully withheld." *See id*. at 1096. Like other courts, the *Cobell* court applied a series of factors derived from that Circuit's precedent. *See Telecomms. Research & Action Ctr. v. Fed. Commc'ns Comm'n*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). The *TRAC* factors weigh, inter alia, the interests at stake and the effect of expediting the delayed agency action in granting an injunction. *Id*. at 80. The *TRAC* decision also determined that an injunction need not issue automatically, even if the plaintiff has demonstrated a right to relief. *See id*. at 79. But the *TRAC* court carefully confined its analysis to unreasonably delayed agency actions, and thus preserved an important distinction that is supported by several sound reasons.

First, as the *TRAC* court acknowledged — and as we have recognized — an action that is "delayed" rather than "withheld" is not generally a "final action" that can be addressed under the APA. *See TRAC*, 750 F.2d at 79 ("Claims of unreasonable agency delay clearly fall into that narrow class of interlocutory appeals from agency action over which we appropriately should exercise our jurisdiction."); *see also In re City of Va. Beach*, 42 F.3d at 885 (reviewing "interlocutory" challenge by way of mandamus but

32

observing that "final action" by agency would be reviewed under APA). Accordingly, claims of unreasonable delay can be properly addressed through a mandamus proceeding, and ordinary equitable considerations will apply. *See TRAC*, 750 F.2d at 79; *cf. Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002) (declining to apply the *TRAC* factors against agency action "unlawfully withheld" because "Congress has specifically provided a deadline for performance" by the agency and thus "no balancing of factors is required or permitted"); *see also In re City of Va. Beach*, 42 F.3d at 885 (reviewing "interlocutory" challenge by way of mandamus).

Second, the "unreasonably delayed" provision in § 706(1) injects discretion into the district court's analysis by using reasonableness as its touchstone. *See Cobell*, 240 F.3d at 1096 (observing that APA requires court to determine "whether agency delay is unreasonable" (quoting *Forest Guardians*, 174 F.3d at 1190)); *SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 119-20 (D.D.C. 2015) (collecting decisions showing there is "no per se rule" governing permissible extent of agency delay but that court should apply "rule of reason"). Put simply, there is no way for a reviewing court to determine that an agency has "unreasonably" delayed taking action without engaging in some discretionary analysis.

By contrast, no such qualifier applies to an agency action "unlawfully withheld," such as an agency's failure to meet a hard statutory deadline. *See Forest Guardians*, 174 F.3d at 1190 (citing *Sierra Club*, 828 F.2d at 794-95 & nn. 77-80) (distinguishing "unreasonably delayed" and "unlawfully withheld" actions). As previously discussed, the text of § 706(1) has no ambiguity and leaves no space for discretion when a court

addresses an unlawfully withheld agency action. And we discern no basis for applying the discretionary factors that normally govern claims for unreasonably delayed actions to claims for unlawfully withheld actions. Indeed, we are aware of no federal court applying the reasoning of "unreasonably delayed" jurisprudence to "unlawfully withheld" cases.

The only appeals court decision that comes close to supporting the DOE's preferred position is *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166 (9th Cir. 2002). There, the Ninth Circuit addressed a claim under the Endangered Species Act, which the court reviewed under the APA as an unlawfully withheld agency action. *See id.* at 1176-77 & n.11. In enforcing the Interior Department's statutory obligations, the court suggested that injunctive relief for violation of a federal statute should issue only if "necessary to effectuate the congressional purpose behind the statute." *Id.* at 1177 (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)). This pronouncement, however, fails to support DOE's contention that relief for unlawfully withheld agency actions depends upon an exercise of the court's equitable discretion. We emphasize three supporting reasons.

First, an analysis of the congressional purpose of a federal statute does not equate to an exercise of equitable discretion. Indeed, the Ninth Circuit's *Badgley* decision distinguished the two modes of analysis. *See id.* (explaining that statutory purpose controlled issuance of injunctive relief "regardless of the equities involved"). Second, in addressing injunctive relief, the *Badgley* court did not consider or address the text of § 706(1). It invoked basic principles of injunctive relief more generally and relied on

34

Supreme Court decisions that describe those principles but lack any connection to § 706(1). *See Badgley*, 309 F.3d at 1177 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Tenn. Valley Auth.*, 437 U.S. at 194). Again, none of those decisions engaged with the language of § 706(1). And the general principles they expound do not override the text of § 706(1). Indeed, the Supreme Court's *Tennessee Valley Authority* decision expressly affirmed the primacy of the statutory mandate. *See* 437 U.S. at 194. Thus, we are not persuaded by *Badgley*'s reasoning, insofar as it implies a departure from the plain language of § 706(1).

Finally, the more recent Ninth Circuit decision in *Vietnam Veterans* — in 2015 — squarely addressed the meaning of § 706(1) and concluded that it imposed a mandatory duty on courts to order relief in cases of agency action unlawfully withheld. *See* 811 F.3d at 1081. That decision accords with our understanding and confirms the distinction in § 706(1) between claims challenging "unlawfully withheld" agency actions and claims asserting that an agency action was "unreasonably delayed."

d.

Lastly, before turning to the provisions of the Injunction, we will evaluate the impact of the principles of equitable relief on the application of § 706(1). Contrary to the position advanced by the DOE, the general rules for injunctive relief, derived from equity, do not control relief under § 706(1).

As an initial matter, the DOE relies on the Supreme Court's decision in *Abbott Laboratories v. Gardner* and argues the proposition that all injunctive relief is necessarily discretionary. *See* 387 U.S. 136 (1967). *Abbott Laboratories* addressed injunctive relief

35

being sought under, inter alia, the APA, and observed that "injunctive and declaratory judgment remedies" are "equitable in nature." *Id*. at 148, 155. But the Court made those comments in assessing a ripeness issue, not the propriety or scope of available relief under § 706(1). In fact, *Abbot Laboratories* nowhere addresses § 706(1), let alone assesses its text. In such a circumstance, a generalized and disconnected observation cannot undermine the clear statutory text. *See Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) (collecting decisions explaining that unaddressed issues or assumptions are not binding precedent).

We also recognize, as the Supreme Court has explained, that the courts "do not lightly assume that Congress has intended to depart from established principles" of injunctive relief. *Weinberger*, 456 U.S. at 313. But "Congress may intervene and guide or control the exercise of the courts' discretion," and limit our equitable powers "in so many words, or by a necessary and inescapable inference." *Id*. Notably, Congress has done so here. The text of § 706(1) demonstrates Congress's clear intention to circumscribe a reviewing court's equitable powers. It would be difficult to imagine a provision "whose terms were any plainer" in their effect, which mandates relief in qualifying circumstances. *See id.* (quoting *Tenn. Valley Auth.*, 437 U.S. at 173).

In sum, the decisions relied on by DOE that apply equitable principles, *see id*., or expound on the scope of mandamus relief, *see, e.g.*, *Cheney*, 542 U.S. at 380, do not dictate our analysis of § 706(1). As we have explained, § 706(1) does not incorporate or depend upon mandamus or other equitable principles. Accordingly, the decisions

36

invoked by DOE do not demonstrate that a court granting relief pursuant to § 706(1) must assess or balance equitable considerations before doing so.

Indeed, no federal court that has granted injunctive relief to redress unlawfully withheld agency action appears to have engaged in equitable balancing. *See Viet. Veterans of Am.*, 811 F.3d at 1080, 1082 (affirming order compelling agency action without discussing equitable factors); *Massie v. U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 340, 347, 354-57 (3d Cir. 2010) (ordering defendant agency to take unlawfully withheld action without considering equities); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 578 (9th Cir. 2000) (affirming order compelling agency action without discussing equitable factors); *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1172-73 (10th Cir. 1997) (ordering defendant agency to take unlawfully withheld action without considering equities). Instead, the discernable practice of the federal courts has been to exercise discretion in fashioning the injunctive relief orders, rather than in making initial decisions to award injunctive relief. *See, e.g.*, *Viet. Veterans of Am.*, 811 F.3d at 1079-80 (holding that injunction was "appropriately tailored to direct the Army to carry out its duty" while preserving the Army's authorized discretion "to develop the appropriate policies in order to carry out that duty"). In these circumstances, we are satisfied to reject DOE's first contention of error, and turn now to its contentions concerning the Injunction entered by the district court.

B.

We review the provisions of an injunctive order for abuse of discretion. *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 125 (4th Cir. 2011). For such orders

37

issued under § 706(1), a reviewing court must compel the unlawfully withheld agency action but is not entitled to dictate the means by which the agency must undertake the action. *See SUWA*, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."). Courts should also "avoid judicial entanglement in abstract policy disagreements." *Id*. at 66.

Although the district court was obliged to compel the DOE's compliance with the statutory mandate of § 2566(c), the precise relief that it ordered had to be tailored to the circumstances. To illustrate the point, the DOE could not — in December of 2017 — have been ordered to remove any amount of defense plutonium from South Carolina by January 1, 2016. An appropriate order ensuring DOE's compliance with the statutory mandate had to reflect the reality of the situation. *See Forest Guardians*, 174 F.3d at 1193 (explaining that "any order now to impose a new deadline for compliance must consider what work is necessary to publish the final rule and how quickly that can be accomplished").

Thus, a determination of appropriate injunctive relief requires an exercise of the trial court's broad discretion, permitting application of the ordinary standard of appellate review. Accordingly, we will assess whether the district court abused its discretion in crafting the Injunction. More specifically, we address the DOE's objection to the two-year deadline for removing not less than one metric ton of defense plutonium from South

Carolina. DOE contends that the text and history of § 2566(c) fail to support such a provision and that satisfaction of the two-year deadline is impossible.

1.

To the extent the DOE objects to any injunction being entered, that contention readily fails in light of our analysis of § 706(1) and the text and purpose of § 2566(c). Section 2566(c) could hardly be clearer in its deadlines, including for the removal of defense plutonium from South Carolina if the MOX production objective is not achieved. Moreover, those deadlines reflect the Secretary of Energy's own proposal, following congressionally mandated negotiations with South Carolina. The statutory deadlines promote one of the purposes outlined in the initial NDAA authorizing the MOX project: ensuring an expeditious disposal of the defense plutonium in South Carolina, either by MOX processing or by removal. *See* NDAA FY 2003, § 3181(6). Importantly, the two most recently enacted NDAAs did not modify the deadlines fixed by § 2566(c). They instead reiterated Congress's desire that the plutonium transferred to the SRS be either processed or removed from the State. *See* National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 3119 (2018); National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 3121, 131 Stat. 1012, 1892-93 (2017).

Finally, nothing in the history or structure of § 2566 militates against an award of injunctive relief. Contrary to DOE's assertion, the fact that Congress provided additional remedies by way of assistance payments does not demonstrate its intention to preclude other remedies. The removal provision and the assistance payments appear sequentially in § 2566, and each employed similarly-worded mandatory language. *See* 50 U.S.C.

39

§ 2566(c), (d). Furthermore, the provision with respect to assistance payments actually addresses the possibility that South Carolina might secure an injunction affecting DOE's work on the MOX project. *See* § 2566(d)(3) ("If the State of South Carolina obtains an injunction" that affects DOE's ability to meet a statutory deadline, "that deadline shall be extended . . . ."). Thus, Congress contemplated that the State might obtain injunctive relief from a federal court and sought to coordinate any such injunction with the orderly administration of other mandates contained in § 2566. Nor does the fact that Congress had previously extended the deadlines fixed in § 2566(c) support the contention that the current deadlines could be ignored by the DOE. If anything, that Congress declined to extend the deadlines provides further support for their continued force. *See, e.g.*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147-48 (2000) (considering Congress's failure to authorize tobacco regulation in ruling that such regulation not legally permissible).

In addition to the foregoing, our assessment of the text and history of § 2566(c) supports the Injunction's two-year timeline for removal of defense plutonium. In the absence of detailed information from DOE supporting an alternative timeframe, the district court was entitled to rely on Congress's initial determination that two years was a sufficient time for the removal mandated by § 2566(c). The court gave DOE a full opportunity to inform the Injunction's provisions, which DOE declined to do. The court was then entitled to rely on the judgment of Congress, particularly when the statute actually borrowed the DOE's initial proposal to South Carolina and Congress. The two-year timeline was not a surprise to the DOE, given its primary role in the matter. DOE

40

knew of the difficulties facing the MOX project and thus the likelihood that the contingent provisions of § 2566(c) would be triggered. In these circumstances, the court did not abuse its discretion in fixing the two-year timeline for removal.

On appeal, the DOE has presented us with no authority that limits a district court's ability to set firm deadlines to compel a lawful agency action, either generally or in this situation. In fact, other federal courts faced with missed deadlines for agency action have set firm dates for compliance. *See Badgley*, 309 F.3d at 1178 (affirming injunctive order, including deadlines and denial of additional time for compliance)[11]; *Forest Guardians*, 174 F.3d at 1193 (remanding for district court to set compliance deadline)[12]; *Natural Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 704-05 (D.C. Cir. 1974) (affirming district court's timetable given missed statutory deadline and lack of progress toward compliance). DOE has instead emphasized its continuing preference for downblending and described the obstacles it faces in accomplishing plutonium disposal at SRS through that method. But the district court properly rejected those arguments in light of § 2566(c)'s specific mandate, explaining:

> Defendants [the DOE] are permitted to pursue the downblending process to meet their statutory obligations *only if* it assists in removing the defense

---

[11] The district court in *Badgley* had fixed date-certain deadlines for the agency's compliance. *See Biodiversity Legal Found. v. Badgley*, No. CIV. 98-1093-KI, 1999 WL 1042567, at *7 (D. Or. Nov. 17, 1999).

[12] On remand, the *Forest Guardians* district court fixed a thirty-day deadline for the agency to issue the delinquent finding. *See Forest Guardians v. Babbitt*, No. 1:97-cv-00453-JEC-DJS (D.N.M. Feb. 22, 1999), ECF No. 35.

> plutonium from South Carolina in the most expeditious way possible while in compliance with § 2566(c)(1).

*See* Injunction 5; *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 193 (D.C. Cir. 2016) (ruling that, when agency has failed to comply with statutory deadline, court must curtail agency's discretion and agency must "find some other way" to meet deadline, because "congressionally imposed mandates and prohibitions trump discretionary decisions"); *Forest Guardians*, 174 F.3d at 1193 (ruling that order compelling agency action must be entered "without regard" to agency's "preferred priorities").

In framing the provisions of the Injunction, the district court appropriately considered the importance of the second deadline imposed by § 2566(c): that an amount equivalent to all defense plutonium transferred to the SRS since April 2002 must be removed from South Carolina by January 1, 2022. *See* 50 U.S.C. § 2566(c)(2); Injunction 5. It is elementary that a statute establishing two sequential deadlines should be interpreted to give effect to them both. *See Badgley*, 309 F.3d at 1175 (concluding that firm twelve-month deadline established outer limit for more flexible initial ninety-day deadline); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) (observing that "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme"). The court thus did not abuse its discretion in declining to include in the Injunction a deadline that would contravene § 2566(c)(2), as urged by the DOE.

2.

DOE's final substantive contention is that the removal of not less than a metric ton of defense plutonium from South Carolina within two years is simply impossible if DOE also complies with NEPA and the applicable regulations, as § 2566 requires. Put succinctly, however, the district court did not abuse its discretion in rejecting this proposition. At least two sound reasons support the court's conclusion in that regard.

First, DOE failed to produce any evidence showing that its compliance with a two-year removal deadline was truly impossible. For example, the DOE never provided the district court with a reasonable explanation of the possible timelines if alternate means for removal were used. The estimates it supplied the court were imprecise, amounting to a period of more than five years. DOE's estimates also assumed that the removal would require a lengthy new environmental analysis pursuant to NEPA. Although DOE did not fully explain that assumption, it apparently refers to EIS assessments that precede certain agency actions subject to NEPA. *See* J.A. 854-55; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (discussing NEPA provisions). As discussed earlier, however, an EIS is not required for all agency actions; in some situations a "more limited document, an Environmental Assessment (EA)" can suffice. *See Dep't of Transp.*, 541 U.S. at 757. DOE failed to explain why a full EIS would be necessary, or to further clarify its vague removal timeline. Without sufficiently supporting its position in this regard, the DOE cannot fault the lower court for failing to adopt it.

Second, the district court did not abuse its discretion in ruling that DOE could raise its impossibility argument at a later time — if necessary — after the Injunction was

43

entered. We have previously affirmed an injunction where the defendant agency contended that the mandated act was impossible. *See Robertson v. Jackson*, 972 F.2d 529, 535 (4th Cir. 1992) (compelling defendant commissioner's compliance with statutory obligation and ruling that commissioner could raise impossibility defense at any subsequent contempt proceeding). Because DOE failed to convince the court that compliance with the Injunction was actually impossible (rather than merely difficult, inconvenient, or potentially impossible), the court was entitled to order compliance. *See id.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983) (explaining that contempt proceedings contemplate defenses of "a *present* inability to comply")).

We thus affirm the principle that a district court retains discretion to order agency compliance, including by fixing firm deadlines if appropriate, and even when full compliance may be unlikely. Such an injunction will serve, in part, to ensure that the delinquent agency makes serious, "vigorous[]" attempts to fulfill its statutory responsibilities. *See id.*; *see also Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir. 1991) ("Impossibility of perfect compliance, then, may be a defense to contempt, but it does not preclude an injunction requiring compliance . . . when a pattern of non-compliance has been shown . . . ."); *Forest Guardians*, 174 F.3d at 1192-93 (rejecting impossibility defense at remedy stage in favor of assertion in subsequent contempt proceedings).[13]

---

[13] As the *Forest Guardians* decision acknowledged, the Ninth Circuit had, on another occasion, delayed relief on impossibility grounds. *See Forest Guardians*, 174 F.3d at 1188-89 (citing *Envt'l Def. Ctr. v. Babbitt*, 73 F.3d 867 (9th Cir. 1995)). In that (Continued)

DOE is not, as it suggests, being forced into potential liability for contempt by our conclusion today. DOE can always petition the district court for relief from the Injunction and seek to show its sincere and diligent efforts to comply therewith. *See Brown v. Plata*, 563 U.S. 493, 545 (2011) (affirming injunctive order containing firm deadline but instructing that court "must remain open to appropriate modification"); *Train*, 510 F.2d at 333-34 (affirming date-certain deadline for agency action but recognizing that defendant could petition for modification).

In sum, the district court, in carefully crafting the Injunction, gave full consideration to the positions of the parties and the record. It thus did not abuse its discretion or improperly burden DOE by imposing § 2566(c)'s two-year removal timeframe.

IV.

Pursuant to the foregoing, we reject the DOE's appellate contentions and affirm the Injunction entered by the district court.

*AFFIRMED*

---

instance, the court of appeals concluded that the plaintiffs merited relief for unlawfully withheld agency action, but faced an intervening congressional moratorium barring any expenditures on that action. *See Envt'l Def. Ctr.*, 73 F.3d at 872. Such extraordinary circumstances are not present here. Even then, however, the Ninth Circuit instructed that relief should be delayed until the moratorium ended, at which time the district court could fix an appropriate deadline. *See id.*